(Slip Opinion) OCTOBER TERM, 2008 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PEARSON ET AL. *v.* CALLAHAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 07–751.   Argued October 14, 2008—Decided January 21, 2009

After the Utah Court of Appeals vacated respondent's conviction for possession and distribution of drugs, which he sold to an undercover informant he had voluntarily admitted into his house, he brought this 42 U. S. C. §1983 damages action in federal court, alleging that petitioners, the officers who supervised and conducted the warrantless search of the premises that led to his arrest after the sale, had violated the Fourth Amendment.  The District Court granted summary judgment in favor of the officers.  Noting that other courts had adopted the "consent-once-removed" doctrine—which permits a warrantless police entry into a home when consent to enter has already been granted to an undercover officer who has observed contraband in plain view—the court concluded that the officers were entitled to qualified immunity because they could reasonably have believed that the doctrine authorized their conduct.  Following the procedure mandated in *Saucier* v. *Katz*, 533 U. S. 194, the Tenth Circuit held that petitioners were not entitled to qualified immunity. The court disapproved broadening the consent-once-removed doctrine to situations in which the person granted initial consent was not an undercover officer, but merely an informant.  It further held that the Fourth Amendment right to be free in one's home from unreasonable searches and arrests was clearly established at the time of respondent's arrest, and determined that, under this Court's clearly established precedents, warrantless entries into a home are *per se* unreasonable unless they satisfy one of the two established exceptions for consent and exigent circumstances.  The court concluded that petitioners could not reasonably have believed that their conduct was lawful because they knew that (1) they had no warrant; (2) respondent had not consented to their entry; and (3) his consent to the entry

of an informant could not reasonably be interpreted to extend to them. In granting certiorari, this Court directed the parties to address whether *Saucier* should be overruled in light of widespread criticism directed at it.

*Held:*

 1. The *Saucier* procedure should not be regarded as an inflexible requirement. Pp. 5–19.

 (a) *Saucier* mandated, see 533 U. S., at 194, a two-step sequence for resolving government officials' qualified immunity claims: A court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was "clearly established" at the time of the defendant's alleged misconduct, *id.*, at 201. Qualified immunity applies unless the official's conduct violated such a right. *Anderson* v. *Creighton*, 483 U. S. 635, 640. Pp. 5–7.

 (b) *Stare decisis* does not prevent this Court from determining whether the *Saucier* procedure should be modified or abandoned. Revisiting precedent is particularly appropriate where, as here, a departure would not upset settled expectations, see, *e.g., United States* v. *Gaudin*, 515 U. S. 506, 521; the precedent consists of a rule that is judge-made and adopted to improve court operations, not a statute promulgated by Congress, see, *e.g., State Oil Co.* v. *Khan*, 522 U. S. 3, 20*;* and the precedent has "been questioned by Members of th[is] Court in later decisions, and [has] defied consistent application by the lower courts," *Payne* v. *Tennessee*, 501 U. S. 808, 829–830. Respondent's argument that *Saucier* should not be reconsidered unless the Court concludes that it was "badly reasoned" or that its rule has proved "unworkable," see *Payne, supra*, at 827, is rejected. Those standards are out of place in the present context, where a considerable body of new experience supports a determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained. Pp. 7–10.

 (c) Reconsideration of the *Saucier* procedure demonstrates that, while the sequence set forth therein is often appropriate, it should no longer be regarded as mandatory in all cases. Pp. 10–19.

 (i) The Court continues to recognize that the *Saucier* protocol is often beneficial. In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all. And *Saucier* was correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable for questions that do not frequently arise in cases in which a qualified immunity defense is unavailable. See 533 U. S., at 194. Pp. 10–11.

(ii) Nevertheless, experience in this Court and the lower federal courts has pointed out the rigid *Saucier* procedure's shortcomings. For example, it may result in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the case's outcome, and waste the parties' resources by forcing them to assume the costs of litigating constitutional questions and endure delays attributable to resolving those questions when the suit otherwise could be disposed of more readily. Moreover, although the procedure's first prong is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development. Further, when qualified immunity is asserted at the pleading stage, the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed. And the first step may create a risk of bad decisionmaking, as where the briefing of constitutional questions is woefully inadequate. Application of the *Saucier* rule also may make it hard for affected parties to obtain appellate review of constitutional decisions having a serious prospective effect on their operations. For example, where a court holds that a defendant has committed a constitutional violation, but then holds that the violation was not clearly established, the defendant, as the winning party, may have his right to appeal the adverse constitutional holding challenged. Because rigid adherence to *Saucier* departs from the general rule of constitutional avoidance, cf., *e.g., Scott* v. *Harris*, 550 U. S. 372, 388, the Court may appropriately decline to mandate the order of decision that the lower courts must follow, see, *e.g., Strickland* v. *Washington*, 466 U. S. 668, 697. This flexibility properly reflects the Court's respect for the lower federal courts. Because the two-step *Saucier* procedure is often, but not always, advantageous, those judges are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case. Pp. 11–17.

(iii) Misgivings concerning today's decision are unwarranted. It does not prevent the lower courts from following *Saucier;* it simply recognizes that they should have the discretion to decide whether that procedure is worthwhile in particular cases. Moreover, it will not retard the development of constitutional law, result in a proliferation of damages claims against local governments, or spawn new litigation over the standards for deciding whether to reach the particular case's merits. Pp. 17–19.

2. Petitioners are entitled to qualified immunity because it was not clearly established at the time of the search that their conduct was unconstitutional. When the entry occurred, the consent-once-

removed doctrine had been accepted by two State Supreme Courts and three Federal Courts of Appeals, and not one of the latter had issued a contrary decision. Petitioners were entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on consent-once-removed entries. See *Wilson* v. *Layne*, 526 U. S. 603, 618. Pp. 19–20.

494 F. 3d 891, reversed.

ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–751

_____

## CORDELL PEARSON, ET AL., PETITIONERS v. AFTON CALLAHAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[January 21, 2009]

JUSTICE ALITO delivered the opinion of the Court.

This is an action brought by respondent under Rev. Stat. §1979, 42 U. S. C. §1983, against state law enforcement officers who conducted a warrantless search of his house incident to his arrest for the sale of methamphetamine to an undercover informant whom he had voluntarily admitted to the premises. The Court of Appeals held that petitioners were not entitled to summary judgment on qualified immunity grounds. Following the procedure we mandated in *Saucier* v. *Katz*, 533 U. S. 194 (2001), the Court of Appeals held, first, that respondent adduced facts sufficient to make out a violation of the Fourth Amendment and, second, that the unconstitutionality of the officers' conduct was clearly established. In granting review, we required the parties to address the additional question whether the mandatory procedure set out in *Saucier* should be retained.

We now hold that the *Saucier* procedure should not be regarded as an inflexible requirement and that petitioners are entitled to qualified immunity on the ground that it was not clearly established at the time of the search that

their conduct was unconstitutional.  We therefore reverse.

## I

## A

The Central Utah Narcotics Task Force is charged with investigating illegal drug use and sales.  In 2002, Brian Bartholomew, who became an informant for the task force after having been charged with the unlawful possession of methamphetamine, informed Officer Jeffrey Whatcott that respondent Afton Callahan had arranged to sell Bartholomew methamphetamine later that day.

That evening, Bartholomew arrived at respondent's residence at about 8 p.m.  Once there, Bartholomew went inside and confirmed that respondent had methamphetamine available for sale.  Bartholomew then told respondent that he needed to obtain money to make his purchase and left.

Bartholomew met with members of the task force at about 9 p.m. and told them that he would be able to buy a gram of methamphetamine for $100.  After concluding that Bartholomew was capable of completing the planned purchase, the officers searched him, determined that he had no controlled substances on his person, gave him a marked $100 bill and a concealed electronic transmitter to monitor his conversations, and agreed on a signal that he would give after completing the purchase.

The officers drove Bartholomew to respondent's trailer home, and respondent's daughter let him inside.  Respondent then retrieved a large bag containing methamphetamine from his freezer and sold Bartholomew a gram of methamphetamine, which he put into a small plastic bag.  Bartholomew gave the arrest signal to the officers who were monitoring the conversation, and they entered the trailer through a porch door.  In the enclosed porch, the officers encountered Bartholomew, respondent, and two other persons, and they saw respondent drop a plastic bag,

which they later determined contained methampheta-
mine. The officers then conducted a protective sweep
of the premises. In addition to the large bag of meth-
amphetamine, the officers recovered the marked bill
from respondent and a small bag containing meth-
amphetamine from Bartholomew, and they found drug
syringes in the residence. As a result, respondent was
charged with the unlawful possession and distribution of
methamphetamine.

## B

The trial court held that the warrantless arrest and
search were supported by exigent circumstances. On
respondent's appeal from his conviction, the Utah attorney
general conceded the absence of exigent circumstances,
but urged that the inevitable discovery doctrine justified
introduction of the fruits of the warrantless search. The
Utah Court of Appeals disagreed and vacated respondent's
conviction. See *State* v. *Callahan*, 2004 LIT App. 164, 93
P. 3d 103. Respondent then brought this damages action
under 42 U. S. C. §1983 in the United States District
Court for the District of Utah, alleging that the officers
had violated the Fourth Amendment by entering his home
without a warrant. See *Callahan* v. *Millard Cty.*, No.
2:04–CV–00952, 2006 WL 1409130 (2006).

In granting the officers' motion for summary judgment,
the District Court noted that other courts had adopted the
"consent-once-removed" doctrine, which permits a war-
rantless entry by police officers into a home when consent
to enter has already been granted to an undercover officer
or informant who has observed contraband in plain view.
Believing that this doctrine was in tension with our inter-
vening decision in *Georgia* v. *Randolph*, 547 U. S. 103
(2006), the District Court concluded that "the simplest
approach is to assume that the Supreme Court will ulti-
mately reject the [consent-once-removed] doctrine and find

that searches such as the one in this case are not reasonable under the Fourth Amendment." 2006 WL 1409130, at *8. The Court then held that the officers were entitled to qualified immunity because they could reasonably have believed that the consent-once-removed doctrine authorized their conduct.

On appeal, a divided panel of the Tenth Circuit held that petitioners' conduct violated respondent's Fourth Amendment rights. *Callahan* v. *Millard Cty.*, 494 F. 3d 891, 895–899 (2007). The panel majority stated that "[t]he 'consent-once-removed' doctrine applies when an undercover officer enters a house at the express invitation of someone with authority to consent, establishes probable cause to arrest or search, and then immediately summons other officers for assistance." *Id.*, at 896. The majority took no issue with application of the doctrine when the initial consent was granted to an undercover law enforcement officer, but the majority disagreed with decisions that "broade[n] this doctrine to grant informants the same capabilities as undercover officers." *Ibid.*

The Tenth Circuit panel further held that the Fourth Amendment right that it recognized was clearly established at the time of respondent's arrest. *Id.*, at 898–899. "In this case," the majority stated, "the relevant right is the right to be free in one's home from unreasonable searches and arrests." *Id.*, at 898. The Court determined that, under the clearly established precedents of this Court and the Tenth Circuit, "warrantless entries into a home are per se unreasonable unless they satisfy the established exceptions." *Id.*, at 898–899. In the panel's words, "the Supreme Court and the Tenth Circuit have clearly established that to allow police entry into a home, the only two exceptions to the warrant requirement are consent and exigent circumstances." *Id.*, at 899. Against that backdrop, the panel concluded, petitioners could not reasonably have believed that their conduct was lawful

because petitioners "knew (1) they had no warrant; (2) [respondent] had not consented to their entry; and (3) [respondent's] consent to the entry of an informant could not reasonably be interpreted to extend to them." *Ibid.*

In dissent, Judge Kelly argued that "no constitutional violation occurred in this case" because, by inviting Bartholomew into his house and participating in a narcotics transaction there, respondent had compromised the privacy of the residence and had assumed the risk that Bartholomew would reveal their dealings to the police. *Id.*, at 903. Judge Kelly further concluded that, even if petitioners' conduct had been unlawful, they were nevertheless entitled to qualified immunity because the constitutional right at issue—"the right to be free from the warrantless entry of police officers into one's home to effectuate an arrest after one has granted voluntary, consensual entry to a confidential informant and undertaken criminal activity giving rise to probable cause"—was not "clearly established" at the time of the events in question. *Id.*, at 903–904.

As noted, the Court of Appeals followed the *Saucier* procedure. The *Saucier* procedure has been criticized by Members of this Court and by lower court judges, who have been required to apply the procedure in a great variety of cases and thus have much firsthand experience bearing on its advantages and disadvantages. Accordingly, in granting certiorari, we directed the parties to address the question whether *Saucier* should be overruled. 552 U. S. \_\_\_ (2008).

II
A

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh* v. *Ramirez*, 540 U. S. 551, 567 (2004) (KENNEDY, J., dissenting) (citing *Butz* v. *Economou*, 438 U. S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1985) (emphasis deleted). Indeed, we have made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson* v. *Creighton*, 483 U. S. 635, 640, n. 2 (1987). Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter* v. *Bryant*, 502 U. S. 224, 227 (1991) *(per curiam)*.

In *Saucier,* 533 U. S. 194, this Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. 533 U. S., at 201. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Ibid.*

Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. *Anderson, supra,* at 640.

Our decisions prior to *Saucier* had held that "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento* v. *Lewis*, 523 U. S. 833, 841, n. 5 (1998). *Saucier* made that suggestion a mandate. For the first time, we held that whether "the facts alleged show the officer's conduct violated a constitutional right . . . *must* be the initial inquiry" in every qualified immunity case. 533 U. S., at 20 (emphasis added). Only after completing this first step, we said, may a court turn to "the next, sequential step," namely, "whether the right was clearly established." *Ibid.*

This two-step procedure, the *Saucier* Court reasoned, is necessary to support the Constitution's "elaboration from case to case" and to prevent constitutional stagnation. *Ibid.* "The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Ibid.*

B

In considering whether the *Saucier* procedure should be modified or abandoned, we must begin with the doctrine of *stare decisis. Stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Although "[w]e approach the reconsideration of [our] decisions . . . with the utmost caution," "[s]*tare decisis* is not an inexorable command." *State Oil Co.* v. *Khan*, 522 U. S. 3, 20 (1997) (internal quotation marks omitted). Revisit-

ing precedent is particularly appropriate where, as here, a departure would not upset expectations, the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent's shortcomings.

"Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved; the opposite is true in cases . . . involving procedural and evidentiary rules" that do not produce such reliance. *Payne, supra,* at 828 (citations omitted). Like rules governing procedures and the admission of evidence in the trial courts, *Saucier*'s two-step protocol does not affect the way in which parties order their affairs. Withdrawing from *Saucier*'s categorical rule would not upset settled expectations on anyone's part. See *United States* v. *Gaudin*, 515 U. S. 506, 521 (1995).

Nor does this matter implicate "the general presumption that legislative changes should be left to Congress." *Khan, supra,* at 20. We recognize that "considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation." *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736 (1977). But the *Saucier* rule is judge made and implicates an important matter involving internal Judicial Branch operations. Any change should come from this Court, not Congress.

Respondent argues that the *Saucier* procedure should not be reconsidered unless we conclude that its justification was "badly reasoned" or that the rule has proved to be "unworkable," see *Payne, supra,* at 827, but those standards, which are appropriate when a constitutional or statutory precedent is challenged, are out of place in the present context. Because of the basis and the nature of the *Saucier* two-step protocol, it is sufficient that we now have a considerable body of new experience to consider

regarding the consequences of requiring adherence to this inflexible procedure. This experience supports our present determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained.

Lower court judges, who have had the task of applying the *Saucier* rule on a regular basis for the past eight years, have not been reticent in their criticism of *Saucier*'s "rigid order of battle." See, *e.g.*, *Purtell* v. *Mason*, 527 F. 3d 615, 622 (CA7 2008) ("This 'rigid order of battle' has been criticized on practical, procedural, and substantive grounds"); Leval, Judging Under the Constitution: Dicta About Dicta, 81 N. Y. U. L. Rev. 1249, 1275, 1277 (2006) (referring to *Saucier*'s mandatory two-step framework as "a new and mischievous rule" that amounts to "a puzzling misadventure in constitutional dictum"). And application of the rule has not always been enthusiastic. See *Higazy* v. *Templeton*, 505 F. 3d 161, 179, n. 19 (CA2 2007) ("We do not reach the issue of whether [plaintiff's] Sixth Amendment rights were violated, because principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case"); *Cherrington* v. *Skeeter*, 344 F. 3d 631, 640 (CA6 2003) ("[I]t ultimately is unnecessary for us to decide whether the individual Defendants did or did not heed the Fourth Amendment command . . . because they are entitled to qualified immunity in any event"); *Pearson* v. *Ramos*, 237 F. 3d 881, 884 (CA7 2001) ("Whether [the *Saucier*] rule is absolute may be doubted").

Members of this Court have also voiced criticism of the *Saucier* rule. See *Morse* v. *Frederick*, 551 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 8) (BREYER, J., concurring in judgment in part and dissenting in part) ("I would end the failed *Saucier* experiment now"); *Bunting* v. *Mellen*, 541 U. S. 1019 (2004) (STEVENS, J., joined by GINSBURG and BREYER, JJ., respecting denial of certiorari) (criticizing the "unwise judge-made rule under which courts must decide

whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity"); *Id.*, at 1025 (SCALIA, J., joined by Rehnquist, C. J., dissenting from denial of certiorari) ("We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case" (emphasis in original)); *Brosseau* v. *Haugen*, 543 U. S. 194, 201–202 (2004) (BREYER, J., joined by SCALIA and GINSBURG, JJ., concurring) (urging Court to reconsider *Saucier*'s "rigid 'order of battle,'" which "requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the decision (*e.g.*, qualified immunity) that will satisfactorily resolve the case before the court"); *Saucier*, 533 U. S., at 210 (GINSBURG, J., concurring in judgment) ("The two-part test today's decision imposes holds large potential to confuse").

Where a decision has "been questioned by Members of the Court in later decisions and [has] defied consistent application by the lower courts," these factors weigh in favor of reconsideration. *Payne*, 501 U. S., at 829–830; see also *Crawford* v. *Washington*, 541 U. S. 36, 60 (2004). Collectively, the factors we have noted make our present reevaluation of the *Saucier* two-step protocol appropriate.

## III

On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

### A

Although we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial. For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the "clearly established" prong. "[I]t often may be difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be." *Lyons* v. *Xenia*, 417 F. 3d 565, 581 (CA6 2005) (Sutton, J., concurring). In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all. In addition, the *Saucier* Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.

### B

At the same time, however, the rigid *Saucier* procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise.

Unnecessary litigation of constitutional issues also wastes the parties' resources. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell,* 472 U. S., at 526 (emphasis deleted). *Sau-*

*cier*'s two-step protocol "disserve[s] the purpose of quali-
fied immunity" when it "forces the parties to endure addi-
tional burdens of suit—such as the costs of litigating
constitutional questions and delays attributable to resolv-
ing them—when the suit otherwise could be disposed of
more readily."   Brief for Nat. Assn. of Criminal Defense
Lawyers as *Amicus Curiae* 30.

Although the first prong of the *Saucier* procedure is
intended to further the development of constitutional
precedent, opinions following that procedure often fail to
make a meaningful contribution to such development.   For
one thing, there are cases in which the constitutional
question is so fact-bound that the decision provides little
guidance for future cases.   See *Scott* v. *Harris*, 550 U. S.
372, 388 (2007) (BREYER, J., concurring) (counseling
against the *Saucier* two-step protocol where the question
is "so fact dependent that the result will be confusion
rather than clarity"); *Buchanan* v. *Maine,* 469 F. 3d 158,
168 (CA1 2006) ("We do not think the law elaboration
purpose will be well served here, where the Fourth
Amendment inquiry involves a reasonableness question
which is highly idiosyncratic and heavily dependent on the
facts").

A decision on the underlying constitutional question in a
§1983 damages action or a *Bivens* v. *Six Unknown Fed.
Narcotics Agents,* 403 U. S. 388 (1971),[1] action may have
scant value when it appears that the question will soon be
decided by a higher court.   When presented with a consti-
tutional question on which this Court had just granted
certiorari, the Ninth Circuit elected to "bypass *Saucier's*
first step and decide only whether [the alleged right] was

--------

[1] See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818, and n. 30 (1982) (not-
ing that the Court's decisions equate the qualified immunity of state
officials sued under 42 U. S. C. §1983 with the immunity of federal
officers sued directly under the Constitution).

clearly established." *Motley* v. *Parks*, 432 F. 3d 1072, 1078, and n. 5 (2005) (en banc). Similar considerations may come into play when a court of appeals panel confronts a constitutional question that is pending before the court en banc or when a district court encounters a constitutional question that is before the court of appeals.

A constitutional decision resting on an uncertain interpretation of state law is also of doubtful precedential importance. As a result, several courts have identified an "exception" to the *Saucier* rule for cases in which resolution of the constitutional question requires clarification of an ambiguous state statute. *Egolf* v. *Witmer*, 526 F. 3d 104, 109–111 (CA3 2008); accord, *Tremblay* v. *McClellan*, 350 F. 3d 195, 200 (CA1 2003); *Ehrlich* v. *Glastonbury*, 348 F. 3d 48, 57–60 (CA2 2003). Justifying the decision to grant qualified immunity to the defendant without first resolving, under *Saucier*'s first prong, whether the defendant's conduct violated the Constitution, these courts have observed that *Saucier*'s "underlying principle" of encouraging federal courts to decide unclear legal questions in order to clarify the law for the future "is not meaningfully advanced . . . when the definition of constitutional rights depends on a federal court's uncertain assumptions about state law." *Egolf, supra,* at 110; accord, *Tremblay, supra,* at 200; *Ehrlich, supra,* at 58.

When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify. See *Lyons, supra,* at 582 (Sutton, J., concurring); *Kwai Fun Wong* v. *United States*, 373 F. 3d 952, 957 (CA9 2004); *Mollica* v. *Volker*, 229 F. 3d 366, 374 (CA2 2000). Accordingly, several courts have recognized that the two-step inquiry "is an uncomfortable exercise where . . . the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed" and have suggested that "[i]t may be that *Saucier* was not strictly intended to cover" this situation.

*Dirrane* v. *Brookline Police Dept.*, 315 F. 3d 65, 69–70 (CA1 2002); see also *Robinette* v. *Jones*, 476 F. 3d 585, 592, n. 8 (CA8 2007) (declining to follow *Saucier* because "the parties have provided very few facts to define and limit any holding" on the constitutional question).

There are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking. The lower courts sometimes encounter cases in which the briefing of constitutional questions is woefully inadequate. See *Lyons,* 417 F. 3d, at 582 (Sutton, J., concurring) (noting the "risk that constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented"); *Mollica, supra,* at 374.

Although the *Saucier* rule prescribes the sequence in which the issues must be discussed by a court in its opinion, the rule does not—and obviously cannot—specify the sequence in which judges reach their conclusions in their own internal thought processes. Thus, there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all. In such situations, there is a risk that a court may not devote as much care as it would in other circumstances to the decision of the constitutional issue. See *Horne* v. *Coughlin*, 191 F. 3d, 244, 247 (CA2 1999) ("Judges risk being insufficiently thoughtful and cautious in uttering pronouncements that play no role in their adjudication"); Leval 1278–1279.

Rigid adherence to the *Saucier* rule may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations. Where a court holds that a defendant committed a constitutional violation but that the violation was not clearly established, the defendant may face a difficult situation. As the winning party, the defendant's

right to appeal the adverse holding on the constitutional question may be contested. See *Bunting,* 541 U. S., at 1025 (SCALIA, J., dissenting from denial of certiorari) ("The perception of unreviewability undermines adherence to the sequencing rule we . . . created" in Saucier);[2] see also *Kalka* v. *Hawk*, 215 F. 3d 90, 96, n. 9 (CADC 2000) (noting that "[n]ormally, a party may not appeal from a favorable judgment" and that the Supreme Court "has apparently never granted the certiorari petition of a party who prevailed in the appellate court"). In cases like *Bunting*, the "prevailing" defendant faces an unenviable choice: "compl[y] with the lower court's advisory dictum without opportunity to seek appellate [or certiorari] review," or "def[y] the views of the lower court, adher[e] to practices that have been declared illegal, and thus invit[e] new suits" and potential "punitive damages." *Horne, supra,* at 247–248.

Adherence to *Saucier*'s two-step protocol departs from the general rule of constitutional avoidance and runs counter to the "older, wiser judicial counsel 'not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Scott,* 550 U. S., at 388 (BREYER, J.,

---

[2] In *Bunting*, the Court of Appeals followed the *Saucier* two-step protocol and first held that the Virginia Military Institute's use of the word "God" in a "supper roll call" ceremony violated the Establishment Clause, but then granted the defendants qualified immunity because the law was not clearly established at the relevant time. *Mellen* v. *Bunting*, 327 F. 3d 355, 365–376 (CA4 2003), cert. denied, 541 U. S. 1019 (2004). Although they had a judgment in their favor below, the defendants asked this Court to review the adverse constitutional ruling. Dissenting from the denial of certiorari, JUSTICE SCALIA, joined by Chief Justice Rehnquist, criticized "a perceived procedural tangle of the Court's own making." 541 U. S., at 1022. The "tangle" arose from the Court's "'settled refusal' to entertain an appeal by a party on an issue as to which he prevailed" below, a practice that insulates from review adverse merits decisions that are "locked inside" favorable qualified immunity rulings. *Id.*, at 1023, 1024.

concurring) (quoting *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944)); see *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of").

In other analogous contexts, we have appropriately declined to mandate the order of decision that the lower courts must follow. For example, in *Strickland* v. *Washington*, 466 U. S. 668 (1984), we recognized a two-part test for determining whether a criminal defendant was denied the effective assistance of counsel: The defendant must demonstrate (1) that his counsel's performance fell below what could be expected of a reasonably competent practitioner; and (2) that he was prejudiced by that substandard performance. *Id.*, at 687. After setting forth and applying the analytical framework that courts must use in evaluating claims of ineffective assistance of counsel, we left it to the sound discretion of lower courts to determine the order of decision. *Id.*, at 697 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one").

In *United States* v. *Leon*, 468 U. S. 897 (1984), we created an exception to the exclusionary rule when officers reasonably rely on a facially valid search warrant. *Id.*, at 913. In that context, we recognized that a defendant challenging a search will lose if either: (1) the warrant issued was supported by probable cause; or (2) it was not, but the officers executing it reasonably believed that it was. Again, after setting forth and applying the analytical framework that courts must use in evaluating the good-

faith exception to the Fourth Amendment warrant re-
quirement, we left it to the sound discretion of the lower
courts to determine the order of decision. *Id.*, at 924, 925
("There is no need for courts to adopt the inflexible prac-
tice of always deciding whether the officers' conduct mani-
fested objective good faith before turning to the question
whether the Fourth Amendment has been violated").

This flexibility properly reflects our respect for the lower
federal courts that bear the brunt of adjudicating these
cases. Because the two-step *Saucier* procedure is often,
but not always, advantageous, the judges of the district
courts and the courts of appeals are in the best position to
determine the  order of decisionmaking will best facilitate
the fair and efficient disposition of each case.

C

Any misgivings concerning our decision to withdraw
from the mandate set forth in *Saucier* are unwarranted.
Our decision does not prevent the lower courts from fol-
lowing the *Saucier* procedure; it simply recognizes that
those courts should have the discretion to decide whether
that procedure is worthwhile in particular cases. More-
over, the development of constitutional law is by no means
entirely dependent on cases in which the defendant may
seek qualified immunity. Most of the constitutional issues
that are presented in §1983 damages actions and *Bivens*
cases also arise in cases in which that defense is not avail-
able, such as criminal cases and §1983 cases against a
municipality, as well as §1983 cases against individuals
where injunctive relief is sought instead of or in addition
to damages. See *Lewis*, 523 U. S., at 841, n. 5 (noting that
qualified immunity is unavailable "in a suit to enjoin
future conduct, in an action against a municipality, or in
litigating a suppression motion").

We also do not think that relaxation of *Saucier*'s man-
date is likely to result in a proliferation of damages claims

against local governments.  Compare Brief for Nat. Assn.
of Counties et al., as *Amici Curiae* 29, 30 ("[T]o the extent
that a rule permitting courts to bypass the merits makes it
more difficult for civil rights plaintiffs to pursue novel
claims, they will have greater reason to press custom,
policy, or practice [damages] claims against local govern-
ments").  It is hard to see how the *Saucier* procedure could
have a significant effect on a civil rights plaintiff's decision
whether to seek damages only from a municipal employee
or also from the municipality.  Whether the *Saucier* proce-
dure is mandatory or discretionary, the plaintiff will pre-
sumably take into account the possibility that the individ-
ual defendant will be held to have qualified immunity, and
presumably the plaintiff will seek damages from the mu-
nicipality as well as the individual employee if the benefits
of doing so (any increase in the likelihood of recovery or
collection of damages) outweigh the litigation costs.

Nor do we think that allowing the lower courts to exer-
cise their discretion with respect to the *Saucier* procedure
will spawn "a new cottage industry of litigation . . . over
the standards for deciding whether to reach the merits in
a given case."  Brief for Nat. Assn. of Counties et al. as
*Amici Curiae* 29, 30.  It does not appear that such a "cot-
tage industry" developed prior to *Saucier*, and we see no
reason why our decision today should produce such a
result.

IV

Turning to the conduct of the officers here, we hold that
petitioners are entitled to qualified immunity because the
entry did not violate clearly established law.  An officer
conducting a search is entitled to qualified immunity
where clearly established law does not show that the
search violated the Fourth Amendment.  See *Anderson,*
483 U. S., at 641.  This inquiry turns on the "objective
legal reasonableness of the action, assessed in light of the

legal rules that were clearly established at the time it was taken." *Wilson* v. *Layne*, 526 U. S. 603, 614 (1999) (internal quotation marks omitted); see *Hope* v. *Pelzer*, 536 U. S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal quotation marks omitted)).

When the entry at issue here occurred in 2002, the "consent-once-removed" doctrine had gained acceptance in the lower courts. This doctrine had been considered by three Federal Courts of Appeals and two State Supreme Courts starting in the early 1980's. See, *e.g.*, *United States* v. *Diaz*, 814 F. 2d 454, 459 (CA7), cert. denied, 484 U. S. 857 (1987); *United States* v. *Bramble*, 103 F. 3d 1475 (CA9 1996); *United States* v. *Pollard*, 215 F. 3d 643, 648–649 (CA6), cert. denied, 531 U. S. 999 (2000); *State* v. *Henry*, 133 N. J. 104, 627 A. 2d 125 (1993); *State* v. *Johnston*, 184 Wis. 2d 794, 518 N. W. 2d 759 (1994). It had been accepted by every one of those courts. Moreover, the Seventh Circuit had approved the doctrine's application to cases involving consensual entries by private citizens acting as confidential informants. See *United States* v. *Paul*, 808 F. 2d, 645, 648 (1986). The Sixth Circuit reached the same conclusion after the events that gave rise to respondent's suit, see *United States* v. *Yoon*, 398 F. 3d 802, 806–808, cert. denied, 546 U. S. 977 (2005), and prior to the Tenth Circuit's decision in the present case, no court of appeals had issued a contrary decision.

The officers here were entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on "consent-once-removed" entries. The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law. Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions. In *Wilson,* we explained that a

Circuit split on the relevant issue had developed after the events that gave rise to suit and concluded that "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." 526 U. S., at 618. Likewise, here, where the divergence of views on the consent-once-removed doctrine was created by the decision of the Court of Appeals in this case, it is improper to subject petitioners to money damages for their conduct.

Because the unlawfulness of the officers' conduct in this case was not clearly established, petitioners are entitled to qualified immunity. We therefore reverse the judgment of the Court of Appeals.

*It is so ordered.*