In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3418

CHERYL MILLER,

*Plaintiff-Appellant,*

*v.*

JOLENE HARBAUGH, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 5381—**Suzanne B. Conlon**, *Judge.*

ARGUED SEPTEMBER 19, 2012—DECIDED OCTOBER 19, 2012

Before BAUER, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* The State of Illinois, through its Department of Juvenile Justice, runs a number of youth detention facilities, to which minors convicted in juvenile delinquency proceedings may be committed if a less restrictive option is not appropriate. See Juvenile Court Act of 1987, 705 ILCS 405/5-750(1). This case involves the sad fate of one such minor, Jamal Miller, who was incarcerated at Illinois Youth Center (IYC)

St. Charles, and briefly at IYC Kewanee, at the age of 16. Jamal had a history of mental illness and was known to have attempted suicide at least three times. Sometime in the early morning of September 1, 2009, Jamal hanged himself from the top bunk in his room. He was not discovered in time to save him. The present lawsuit, brought by his mother on her own behalf and as his representative, accuses a number of state officials of deliberate indifference to Jamal's serious mental illness, in violation of his Fourteenth Amendment rights (analogous for this purpose to Eighth Amendment rights). The district court granted summary judgment for the defendants, and we affirm.

## I

When Jamal arrived at IYC St. Charles in November 2008, the Reception and Classification Unit, which determines where new residents will be housed and what services they require, referred him for assessment by a mental health professional. Dr. Mallikarjuna Kanneganti, a private psychiatrist, conducted Jamal's assessment. His conclusions were grim: he noted in his report that Jamal had a history of Attention Deficit Hyperactivity Disorder, major depression, bipolar disorder, psychosis, behavior disorders, and anger and drug abuse counseling. Over the years, Jamal had taken numerous psychotropic medications. His behavioral history included delinquency, gang affiliations, anger, aggression, setting of fires, cruelty to animals, putting a gun to a cousin's head, threatening to kill teachers, learning disabilities,

alcohol abuse, and cannabis use. This array of problems had resulted in five hospitalizations, most recently about five months earlier, when Jamal had tried to commit suicide by cutting himself with a machete. Dr. Kanneganti also recorded an additional suicide attempt in January 2007, when Jamal had tried to suffocate himself with a pillow, and another when Jamal had tried to hang himself. For his part, Jamal denied that he had manic or depressive symptoms, that he was depressed, or that he had experienced suicidal thoughts since his June 2008 attempt. Dr. Kanneganti decided to prescribe Prozac and lithium for him.

Initially, Jamal was assigned to IYC St. Charles's Special Treatment Unit, which is reserved for residents with chronic mental health disorders involving mild to moderate symptoms and "manageable" suicide risk. After a short time there, the classification personnel recommended that Jamal be transferred to the substance abuse program in the Special Treatment Unit at IYC Kewanee. The latter unit was reserved for residents with acute mental health disorders and moderate to high suicide risk, though it was also the only unit with a program that combined mental health treatment and substance abuse treatment. Dr. Jennifer Jaworski (one of the defendants in our case), the Behavioral Health Services Administrator for the Department as a whole, approved the transfer, and so Jamal was moved to IYC Kewanee in February 2009.

In April 2009, the Kewanee staff placed Jamal on suicide watch, in response to his assault of another

resident and his statement that he was "going to make it worse for [him]self." Five days later, the watch was ended, after he denied any current suicidal or homicidal thoughts. In May 2009, Dr. Victor Kersey, a clinical psychologist normally assigned to IYC Kewanee and another defendant, returned from a one-year stint in Iraq. Only then did he become acquainted with Jamal, largely through Jamal's disciplinary infractions. He also learned through his staff that Jamal was not complying with the rules of the Mental Illness Substance Abuse (MISA) program at Kewanee. This noncompliance resulted in Jamal's dismissal from the program for 30 days, while he stayed in the Special Treatment Unit and was subject to a "behavior contract." Jamal satisfied the terms of this contract and was re-admitted to the MISA program. But his restoration was brief: he misbehaved again, and after eight days he was kicked out. All 24 members of Kewanee's treatment staff, led by Dr. Kersey, then met to decide what to do with Jamal. They concluded that his biggest problems were anger and aggression, and that he was otherwise stable. Since he was not benefitting from the MISA program at Kewanee, they recommended that he be transferred back to IYC St. Charles. Dr. Kersey prepared a memorandum explaining this decision; he shared the memo with defendant Dr. Jolene Harbaugh, the head of mental health services at St. Charles, and Dr. Jaworski. Persuaded that Jamal should be returned to St. Charles, Dr. Jaworski gave her approval, and the transfer took place on August 5, 2009.

Back at St. Charles, Jamal was screened again the day after his arrival for risk of suicide and was found to be

stable. Three days later, Dr. Kanneganti evaluated him and also found him not to be suicidal. During that meeting, Jamal asked if he could be taken off the medications he had been taking for his mental disorders, and Dr. Kanneganti agreed to do so. The doctor later explained that in his view, Jamal did not meet the criteria for forced medication because he was not gravely disabled nor did he pose a likelihood of harm to himself or others. On August 9, Jamal was transferred to a different housing unit and placed alone in a room with a metal-frame bunk bed. There was no mattress on the top bunk. At that time, single-bed rooms were available elsewhere in the St. Charles facility.

On August 12, 18, 25, and 28, Jamal saw a psychologist at St. Charles for mental health treatment. In a report written on August 29 and signed on August 31, the psychologist reported that Jamal seemed oriented, alert, confident, and stable, and that he showed no signs of suicidal ideation, hallucinations, or other severe mental illness. Unfortunately, his assessment proved to be wrong.

An incident that took place during the afternoon of August 31 seems to have triggered the events that led to Jamal's suicide. Around 4:30 p.m., Juvenile Justice Specialist (JJS) Natalie Finley asked the residents to line up after dinner to go to the gym. Jamal became disruptive and started to argue with her. She told him to quiet down and get in line; JJS Sean Kincade came over to help. Later that evening, Jamal apologized to Finley, and she responded that tomorrow is a new day. At 10:00 p.m., JJS Marcia Kozel started her shift. She was

supposed to conduct safety checks of the rooms every 15 minutes; this involved shining her flashlight into the room and recording her checks. When she started her check at 3:09 a.m., the residents were all asleep and the lights were out. She checked A wing first, and then B wing, where Jamal's room was located. When she got there, she looked in the window and thought that she saw him in a squatting position. She turned away, continued her rounds, and then passed his room on the way back. At that point she realized that something was wrong: Jamal's face was against the top of the bunk and there was something around his neck. Kozel immediately called an emergency code over her radio and ran for help. She and another specialist entered his room, found him hanging from the top bunk with a sheet, and cut him down. They started CPR; a nurse came to help; and eventually paramedics arrived. It was too late, however. Before his death, Jamal had posted notes on the walls and door of his cell. One of them was directed to Finley. It said that she "pushed [him] over the edge." He also put a note reading "RIP Jamal Damerco Miller" on his door, but Kozel testified that she did not see it.

## II

On August 26, 2010, Miller filed the present lawsuit under 42 U.S.C. § 1983 and state law against the various Departmental and institutional actors who allegedly had some part to play in Jamal's death. Although she initially named others, in this appeal she has whittled the list down to five people: Kurt Friedenauer, the acting

director of the Department at the time of Jamal's death; Bobby Moore, the superintendent of IYC St. Charles at the relevant time; Dr. Jaworski, the Behavioral Health Services Administrator for the Department; Dr. Harbaugh, the Treatment Administrator at IYC St. Charles, and thus the person responsible for overseeing all health services there; and Dr. Kersey, the clinical psychologist at IYC Kewanee who recommended Jamal's transfer back to IYC St. Charles.

The district court granted the defendants' motion for summary judgment in an order dated October 19, 2011, in which it dismissed the federal claims with prejudice and opted not to exercise supplemental jurisdiction over the state claims and thus dismissed them without prejudice. Because Miller's theory with respect to Friedenauer, Moore, Jaworski, and Harbaugh focused on their adoption of policies—notably the use of bunk beds for potentially suicidal residents—the district court referred to them as the "supervisory defendants." Because there is no vicarious liability under Section 1983, these defendants could be liable only if they personally did something that violated Jamal's rights. The court recognized that an official may be liable if he or she is responsible for a systematic condition that violates the Constitution, or for a failure to intervene. Nevertheless, the court concluded, even assuming that the use of the bunk beds violated the Constitution and the necessary personal involvement was shown, the four supervisory defendants were entitled to qualified immunity. In the district court's opinion, no clearly established law indicated that the suicide prevention measures in place at

IYC St. Charles were inadequate for purposes of the Fourteenth and Eighth Amendments. As for Dr. Kersey, the court found no evidence in the record that would permit a trier of fact to find that he was deliberately indifferent when he decided to transfer Jamal from IYC Kewanee back to IYC St. Charles. Since that was Miller's only theory with respect to him, the court concluded that he was entitled to summary judgment.

### III

#### A

In her appeal from the judgments in favor of the supervisory defendants, Miller asserts that the district court erred in several respects: first, in its holding that their use of the bunk beds was not deliberately indifferent to Jamal's rights under the Eighth and Fourteenth Amendments; second, in its holding that Miller could not prevail unless she could prove that Jamal faced a present or imminent risk of suicide; and third, in its finding that the supervisory defendants were entitled to qualified immunity. (For convenience, we refer only to the Eighth Amendment in the discussion that follows, even though we recognize that juvenile facilities may not be administering the kind of "punishment" that is given to adult prisoners. The standards under the Fourteenth and Eighth Amendments do not differ for our purposes.) All of these points overlap, however. One must show that the plaintiff has alleged a violation of a constitutional right to overcome an assertion of qualified immunity, see *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The question whether the duty to take more active anti-suicide measures arises only when the risk is imminent informs the question whether these defendants have violated Jamal's constitutional rights. The remainder of the qualified immunity defense—whether the rights in question were clearly established—also depends on what rights are at stake. We thus consider all three points together.

Miller's primary argument is that the kind of bunk bed that was in use at IYC St. Charles was, in effect, a death trap for any resident inclined to suicide. And, she continues, St. Charles housed a great number of such people. From 2000 up until the date of Jamal's death, there were 2,929 total suicide attempts at that facility alone. System-wide, of that number there were 625 "moderately serious" attempts, and 169 "serious" attempts. Six residents actually did commit suicide, and three of those (including one at St. Charles) were accomplished by hanging from the same type of metal-frame bunk bed that Jamal used. Within a day or so of Jamal's death, the Special Treatment Unit at St. Charles was re-designated as single-bunk only. Shortly thereafter, Superintendent Moore made an emergency funding request to replace all of the bunk beds at St. Charles with single beds, and that request was granted and eventually implemented.

Director Friedenauer acknowledged in his deposition testimony that the Department knew that the metal-frame bunk beds might be used for suicide. He also knew that there had been other attempts before Jamal's death, including some involving the bunk beds. The beds had

not been replaced, however, because despite his efforts, he could not obtain funding from the Illinois legislature to do so. Superintendent Moore was also aware that the bunk beds could be used for suicides. He, too, mentioned the lack of funding during the time before Jamal's death. Immediately afterwards, however, Moore designated the Special Treatment Unit at St. Charles as single-bed only, and he ordered new beds.

Miller collected evidence showing that it would have been relatively easy to dismantle the metal bunk beds so as to eliminate the top bunk. They were modular and, she asserts, could have been taken apart and converted to single beds. (Other testimony indicated that the task involved more than a simple screwdriver: Moore noted that the beds were secured to the wall and thus removal required some effort.) Miller pointed to a report by the John Howard Association (which advertises itself as a group that "works to achieve a fair, humane and cost-effective criminal justice system by promoting adult and juvenile prison reform" on its website, www.thejha.org). The Association reported that the bunk beds were an obvious danger. (Interestingly, in a report of a monitoring visit to St. Charles issued May 17, 2011, the Association complained that the facility as of that time had still not eliminated the bunk beds. Only in the report of its visit on April 3, 2012, did it find that all of the problematic beds had been replaced.)

In their brief, the supervisory defendants point out that neither the Department nor IYC St. Charles was indifferent to the risk of suicide. Superintendent Moore

recommended to Director Friedenauer that the Master Plan for the Department (which had split off from the Illinois Department of Corrections only in 2005) should include replacing the living units at St. Charles. He identified a number of features of the rooms that could be used for self-harm, including not only the bunk beds, but also the sinks, toilets, and vents. Friedenauer followed through with a recommendation in the 2007 Master Plan for new single-bed living units, but the legislature did not respond. Indeed, in 2009 the entire repair and maintenance budget for the Department was only $150,000.

Director Friedenauer took other measures, however, while he was pursuing capital improvements. He put in place protocols for mental health assessments, he put suicide prevention on the agenda at almost every quarterly meeting, he required suicide prevention meetings at each facility, he developed a training video for this purpose, and he ordered every staff member to carry a "Knife for Life" that could be used in emergencies such as Jamal's. In addition, the staff at St. Charles conducted cell checks every 15 minutes throughout the day and night, and the record demonstrates that Jamal's cell was properly checked.

In order to defeat the defendants' summary judgment motion on her Eighth Amendment claim, Miller had to present evidence that would permit a finding that the defendants were subjectively aware of the risks posed by the bunk beds to persons with a history comparable to Jamal's and that they recklessly failed to take appropriate steps to alleviate that risk. See *Farmer v. Brennan*, 511

U.S. 825, 843 (1994); *Frake v. City of Chicago*, 210 F.3d 779, 781-82 (7th Cir. 2000). With respect to the latter point, we have held that defendants cannot be thought to be reckless if the remedial step was not within their power. See *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997) ("officials do not act with 'deliberate indifference' if they are helpless to correct the protested conditions"). On the other hand, the Supreme Court has intimated that an argument that rests solely on fiscal constraints cannot negate a finding that "cruel and unusual punishment" is being imposed. *Wilson v. Seiter*, 501 U.S. 294, 301-02 (1991).

We are willing to assume, for present purposes, that Miller presented enough evidence to support a finding that the supervisory defendants were subjectively aware of the suicide risks posed by the bunk beds and that alternate measures such as dismantling them or assigning residents to single-bed rooms were feasible. We therefore have no need to decide whether the evidence of the changes at St. Charles in the wake of Jamal's death was excludable as a subsequent remedial measure for purposes of Federal Rule of Evidence 407, or if it instead was admissible to show feasibility of precautionary measures, as permitted by the rule. But even if the evidence, viewed favorably to Miller, would support a finding of a constitutional violation, we must still consider the second part of the qualified immunity inquiry—the question whether any duty the defendants had was clearly established.

As the Supreme Court reaffirmed most recently in *Pearson v. Callahan*, 555 U.S. 223 (2009), a plaintiff seeking

to defeat a defense of qualified immunity must establish two things: first, that she has alleged a deprivation of a constitutional right; and second, that the right in question was "clearly established." *Id.* at 232. Although *Saucier v. Katz*, 533 U.S. 194 (2001), had dictated that these questions always had to be considered in the order in which we have stated them, the Court retreated from that position in *Pearson* and returned to a regime under which either issue could be taken up first. 555 U.S. at 236. We are therefore free to decide first whether the right that Miller has alleged was clearly established. In undertaking this analysis, it is critical to find the correct level of specificity. It is not enough, for instance, to say that it is clearly established that those operating detention facilities must not engage in cruel or unusual punishment. The way that the right is translated into the particular setting makes a difference. The plaintiff must show that the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

That is why it is not enough for Miller to show that residents of juvenile detention facilities have a right not to be housed in unsafe conditions. But what does the law show about the duty of state officials to adopt measures designed to thwart the actions of a suicidal resident? We have held that prison officials violate the Eighth Amendment if they are "cognizant of the significant likelihood that an inmate may imminently seek to take his own life" and then "fail to take reasonable steps to prevent the inmate from performing this act."

*Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001) (internal quotation marks omitted). In *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003), we found that the facts were disputed on the question whether a jail official "was aware that [plaintiff's son] was on the verge of committing suicide." *Id.* at 620. Prison officials have also been found potentially liable where they failed to take reasonable steps to remedy conditions such as extreme cold or heat that posed a danger to all prisoners. See *Dixon*, 114 F.3d at 642.

In asking us to hold that state officials violate the Constitution when they fail to prevent the suicides of inmates who are not actively or "imminently" suicidal, however, Miller is asking us to extend the duties of the facility's officials in an important way. She also suggests without support that the law has clearly established which steps to avert suicides must be taken, on pain of personal liability if they are not. We take these points in turn.

It is one thing to impose a duty on detention facility personnel or prison guards to intervene actively when they see a resident or inmate who is, as we put it in *Cavalieri*, on the verge of suicide. If the state officers can observe or are told that their detainee is indeed so disturbed that his next step is likely to be suicide, and yet they do nothing, it is fair to say that they have gone beyond mere negligence and entered the territory of the deliberately indifferent. This is why *Cavalieri* and *Sanville* spoke of "imminence" or "the verge" of action. If Miller believes that this has not been the law of this circuit, she

is mistaken. If she is arguing instead that we should change that standard, she has essentially conceded that the rule she proposes is not clearly established. Mental illness, including suicidal ideation, comes in many degrees of severity. For those who have had only a fleeting notion that suicide might be the answer, psychiatric care is normally the responsible option to take, rather than putting that person in a padded cell under 24-hour surveillance. Jamal's case fell somewhere between these two extremes. He had a lengthy history of mental disturbances and disorders, wholly apart from the question of suicide, and he had tried to take his own life three times. At both times he entered IYC St. Charles, he appeared to the professionals there who evaluated him to be on a more solid footing. The law as it stood at the time Jamal was being assessed by the St. Charles personnel did not clearly require more from them.

It is possible, however, that Miller admits that much, since her primary argument is that the true violation here was St. Charles's failure to house Jamal (and other juveniles with histories of mental illness and suicide attempts) in rooms without dangerous bunk beds. We accept, as we must, the fact that the supervisory defendants knew that the metal bunk beds had been, and could be again, used by a resident for self-destruction. But so could other items in the room. In this respect, the facts of our case strongly resemble those in *Frake.* There, the City of Chicago used jail cells that had horizontal bars. Using his jacket, the decedent hanged himself from the bar in his cell. 210 F.3d at 781. The decedent's father sued on the theory that the Chicago jails had a history

of inmates hanging themselves on those bars, and thus that the City's failure to redesign the cells represented deliberate indifference. *Id.* at 782. We rejected that theory, both because there was no allegation that the decedent was actively suicidal at the time he was admitted to the jail, and because (even recognizing that no one wants even one suicide) the number of such events was too small to give rise to constitutional liability. *Id.* With respect to the latter point, we emphasized the fact that the City had taken other measures to prevent suicides in the jail, including screening for suicidal ideation, confiscation of items that could be used for self-harm, and checking cells every 15 minutes. *Id.*

We understand that there are some differences between this case and *Frake.* Proportionally, the number of suicides is higher here; the residents here are juveniles whose mental health histories are well known; and there is evidence that single beds were available. Had we found deliberate indifference in *Frake*, this case would have seemed to be a stronger application of the same rule. But we did not. Furthermore, nothing in *Frake* indicated under what circumstances a small number of suicides might lead to liability. And cell design was not the only variable in either case. In both *Frake* and in our case, the detention authorities took other precautions against the possibility that inmates or residents who did not appear to be imminently suicidal might unexpectedly make an attempt. Any of the supervisory defendants who read *Frake* would have thought that he or she was acting within constitutional boundaries.

Even if IYC St. Charles's decision to use the metal bunk beds in rooms occupied by mentally disturbed, but not imminently suicidal, residents amounted to deliberate indifference, and thus amounted to a violation of Jamal's constitutional rights, the law in this area was not clearly established enough to defeat the supervisory defendants' claim of qualified immunity.

B

All that remains is the appeal against Dr. Kersey, the psychologist at IYC Kewanee who authorized Jamal's transfer back to IYC St. Charles. Miller believes that this was a deliberately indifferent act on Dr. Kersey's part, because he knew that St. Charles used the dangerous bunk beds and he knew that Jamal was a suicide risk. But Dr. Kersey's involvement with Jamal was minimal, and no rational trier of fact could find evidence of deliberate indifference in it. Dr. Kersey had nothing to do with Jamal at Kewanee until May 2009, when he returned from his tour of duty in Iraq. At that point, he became aware of Jamal's unsuccessful participation in the drug abuse program. After a meeting with the entire 24-person treatment staff of Kewanee, the collective decision was that Jamal should be returned to St. Charles. Perhaps this group was mistaken in its belief that Jamal would do better in the less structured atmosphere of St. Charles, but that does not demonstrate deliberate indifference. Nor does Dr. Kersey's memo to Drs. Harbaugh and Jaworski explaining why the staff had come to this conclusion demonstrate anything

close to deliberate indifference. Even assuming, as we must, that Dr. Kersey knew that St. Charles was still using the metal bunk beds, he had no idea which room Jamal would be given or that St. Charles's other suicide prevention measures would prove to be inadequate.

## IV

Jamal Miller was a very troubled young man, and it is likely that everyone who cared for him regrets that they were not able to forestall his suicide. But the fact that more measures, or different measures, might have been undertaken, and that those measures might have been successful (though even this is not certain) is not enough to support liability under the Constitution against any of the defendants now before us. The district court chose to dismiss Miller's state claims without prejudice, and we have no comment on how any of them should be resolved. We therefore AFFIRM the judgment of the district court.