OPINION OF THE COURT
JORDAN, Circuit Judge.
The Northern York County Regional Police Department (“NYCRPD”) and several of its officers appeal from an order of *932 the United States District Court for the Middle District of Pennsylvania denying them motion for qualified immunity and summary judgment on Troy and Tammy Hopkinses’ claim of unlawful seizure when Mr. Hopkins was mistaken for a bank robbery suspect. For the following reasons, we will affirm.
I. Background
A. Factual Background
Throughout late 2004 and early 2005, several Sovereign Bank branches in York County, Pennsylvania were robbed by the same armed man. The NYCRPD participated in a task force developed to apprehend the robber. Officers in the task force were given a description of the suspect, identifying him as a large, black male with a muscular build, in his late 20s or early 30s, between 5'10" and 6' tall, weighing between 185 and 200 pounds. The suspect’s method of operation was to approach his targeted bank on foot around closing time, carrying a black or clear plastic bag and a gun. He always wore a ski mask and gloves to cover his features.[1] Police also suspected that, because the robber escaped so quickly, a second person was perhaps involved as a driver, and they identified a silver or gray Dodge Stratus, Aspen, or Neon as potential get-away cars. The suspect was reportedly becoming more aggressive with each robbery, and had even taken a hostage at one point.
The NYCRPD set up surveillance at a likely target bank in York, whereby several officers were posted to observe the bank at closing time in nearby unmarked vehicles. The surveillance operation was overseen by Detective David Steffen.
On February 9, 2005, Detective John Vaughn, II was surveilling the front entrance of the bank. Around closing time, Vaughn saw a silver Ford Expedition pull up to the bank’s drive-through service window as the teller was locking the front door of the bank to close for the day. The vehicle then pulled up to the front of the bank, parking perpendicular to the marked spaces and parallel to the bank’s front door. Next, Vaughn saw Mr. Hopkins, the driver, for two or three seconds as he got out of the car and approached the door of the bank. Mr. Hopkins, who has since passed away, was an African-American who stood approximately 6'1" in height and weighed between 370 and 380 pounds. He was wearing baggy clothing and was carrying a white object that appeared to Vaughn to be a bag. He was not wearing a hat, mask, or other head covering of any description. Vaughn watched as Mr. Hopkins approached the front of the bank, pulled on the locked door, and then returned to his vehicle.
As it turns out, Mr. Hopkins went to the bank that day simply to deposit his paycheck. His wife, Tammy, was in the front passenger seat of the Ford Expedition that he was driving and their two children were in the backseat. Mr. Hopkins had gone first to the drive-through window and, when no one answered his call for service, he drove around front, parked his car, leaving it running, and walked up to the door of the bank with his paycheck in hand. He tried to enter the bank by pulling once on the front door. After he realized that the door was locked, he returned to the car and told his wife that the bank had just closed. Later, during his deposition, Mr. Hopkins confirmed that on the evening in question he wore gray *933 sweat pants, a T-shirt, and a blue winter jacket, and that he was not wearing a hat or gloves.
After observing Mr. Hopkins, Vaughn contacted Detective Migatulski, who was also participating in the surveillance of the bank that evening, informing him that a large black male with something in his hand had attempted to enter the bank. Migatulski relayed the information to Stef-fen. Several police officers, including Vaughn and Migatulski, followed the Hop-kinses’ vehicle as it left the bank. Meanwhile, the officers ran a record check of the Hopkinses’ vehicle and the dispatcher reported that there was no record available.[2]
Steffen authorized a stop of the vehicle, based on the suspicion that Mr. Hopkins was the elusive bank robber. Several officers, again including Vaughn, and at least five police vehicles were involved in the stop, which was effected with a strong showing of force.[3] The officers drew their weapons, pointing them at the vehicle, and, through a loudspeaker, ordered Mr. Hopkins to roll down his window, turn off the ignition, drop his keys on the ground, and open the door to his vehicle from the outside. Mr. Hopkins complied. He was then ordered to exit the vehicle and get down on his knees, which he did, and was handcuffed. He was fully cooperative, and, understandably, asked why he was being handcuffed. He identified himself as a pastor at the Heart of God Christian Worship Center.
Mrs. Hopkins then got out of car to ask what was going on, and she was ordered to get down on her knees, which she did. She was then handcuffed. Around this time, one of the officers told Mr. Hopkins that he resembled a bank robbery suspect. Mr. Hopkins again informed the officers that he was a local pastor and that he was not a bank robber. At some point after they had both been handcuffed, the Hop-kinses stated that them children were still in the car. A police officer eventually checked and confirmed that there were indeed children in the car.
The Hopkinses remained handcuffed while the officers conferred with each other. Approximately twenty-five minutes elapsed between the initial stop and when the Hopkinses heard a police officer say that the handcuffs would be removed. Five minutes later, police uncuffed the Hopkinses but detained them an additional ten to fifteen minutes before allowing them to go. Before the Hopkinses left, Steffen showed them a photograph of a potential suspect in the robberies, a bald, black man with an earring and goatee.[4] Hopkins, who was bald and had a goatee but no earring, told the police that he did not look *934 like the man in the photograph. Steffen responded that, at night, Mr. Hopkins did look like the man in the photograph. The entire stop, from start to finish, took about forty to fifty minutes.
B. Procedural History
Based on the events of February 9, 2005, Mr. and Mrs. Hopkins brought this lawsuit pursuant to 42 U.S.C. § 1983, alleging that they were seized in violation of their Fourth Amendment rights. After the close of discovery, all of the defendants moved for summary judgment and argued, among other things, that they are entitled to qualified immunity.[5]
Reviewing that motion, the District Court first concluded that the stop of Mr. Hopkins constituted an investigatory detention that did not rise to the level of an arrest. Hopkins, 2008 WL 2048699, at *7. Next, the Court concluded that, viewing the facts in the light most favorable to the Hopkinses, “Defendants lacked reasonable suspicion to believe that Troy Hopkins was the bank robber they sought, and thus the initial stop was unlawful.” Id. at 9. Furthermore, the Court concluded that, “[ejven if Defendants had been justified in initially detaining Plaintiffs, their prolonged detention was also unlawful” because, under the circumstances, the defendants failed to “act diligently to confirm or dispel their suspicions” that Mr. Hopkins was the bank robber. Id. at *9. The District Court determined that “a reasonable officer in Defendants’ position would have understood that there was no reasonable suspicion to believe Mr. Hopkins was the bank robber.” Id. Accordingly, the Court found that summary judgment on qualified immunity grounds was not warranted.[6] Id. Appellants moved for reconsideration, which was denied. This timely appeal followed.
II. Jurisdiction and Standard of Review
The District Court had jurisdiction in this case under 28 U.S.C. §§ 1331 and 1343. Pursuant to the collateral order doctrine, we have jurisdiction to review a denial of a claim of qualified immunity to the extent that it turns on an issue of law. Ziccardi v. City of Phila., 288 F.3d 57, 61 (3d Cir.2002). However, “[w]e have no jurisdiction ... to review a District Court’s determination that there is sufficient record evidence to support a set of facts under which there would be no immunity.” See Schieber v. City of Phila., 320 F.3d 409, 415 (3d Cir.2003). In other words, “we may ‘review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right,’ but we may not ‘consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove.’ ” Forbes v. Twp. of Lower Merion, 313 F.3d 144, 147 (3d Cir.2002) (quoting Ziccardi, 288 F.3d at 61).
The Hopkinses argue that we lack jurisdiction because the District Court noted the existence of factual issues — for example, whether Mr. Hopkins committed any traffic violations before he was stopped. See Hopkins, 2008 WL 2048699, at *3, n. 4. Although the District Court acknowledged the existence of disputed facts, it resolved *935 those facts in favor of the Hopkinses for summary judgment purposes, resulting in a set of facts to which the Court applied the law of qualified immunity. Accordingly, we have jurisdiction to determine whether the District Court correctly applied the law to the set of facts it identified as supported by the summary judgment record.
“On review of a denial of summary judgment, we apply a plenary standard of review.” Rivas v. City of Passaic, 365 F.3d 181, 193 (3d Cir.2004). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Fed.R.Civ.P. 56(c)). “In reviewing a denial of summary judgment, this court must view the facts in the light most favorable to the nonmoving party....” Barton v. Curtis, 497 F.3d 331, 334 (3d Cir.2007).
III. Discussion
“The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Pearson v. Callahan, — U.S. -, -, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (internal quotations omitted). Two inquiries govern whether an official is entitled to qualified immunity: (1) whether the facts alleged establish a violation of a constitutional right, and (2) whether the constitutional right at issue was clearly established.[7] Id. at 815-16.
Appellants address only one issue on appeal: whether the District Court erred in finding that the prolonged detention of the Hopkinses was unreasonable and thus violated their constitutional rights. Of course, since the initial stop must have been lawful for the resulting detention to be lawful, we will address the entirety of the officers’ actions in determining whether the Hopkinses constitutional rights were violated.[8] The Hopkinses’ answering brief does not directly respond to the Appellants’ brief but instead argues that the Hopkinses were, in fact, arrested and that, even if the initial stop was merely investigatory, it ripened into an arrest. The Hopkinses further argue that the officers’ actions were unlawful because the police action was never supported by probable cause.
The Fourth Amendment protects individuals from “unreasonable searches and seizures.” U.S. Const, amend. IV. An officer must have probable cause to lawfully arrest an individual. Michigan v. Sum *936 mers, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). However, probable cause is not required for investigatory detentions that fall short of an arrest. Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such investigatory stops need only be supported by an officer’s reasonable suspicion that criminal activity is afoot. Id. at 21, 88 S.Ct. 1868 (“[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” (footnote omitted)).
“[W]hen police officers make an investigative stop, they may take such steps as are ‘reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.’ ” United States v. Edwards, 53 F.3d 616, 619 (3d Cir.1995) (quoting United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). Whether an officer’s detention of an individual during an investigatory stop comports with the Fourth Amendment depends on whether, under the circumstances, the length and intrusiveness of the stop was reasonable in light of the officer’s suspicion. See Hensley, 469 U.S. at 234, 105 S.Ct. at 683; see also Terry, 392 U.S. at 19-20, 88 S.Ct. 1868 (“[I]n determining whether [a] seizure ... [is] ‘unreasonable’ our inquiry is a dual one — whether the officer’s action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.”). “ ‘[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.’ ” United States v. Frost, 999 F.2d 737, 742 (3d Cir.1993) (quoting United States v. Place, 462 U.S. 696, 709-10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)).
The District Court correctly determined that, viewing the facts in the light most favorable to the Hopkinses, the officers acted unreasonably in stopping the Hop-kinses’ vehicle based on Detective Vaughn’s observations of Mr. Hopkins at the bank. Mr. Hopkins, though an African-American man of approximately the height ascribed to the robber, was otherwise dramatically different from the described suspect. He weighed between 370 and 380 pounds, which is roughly twice the 185 to 200 pounds the robber was said to weigh, and, even in baggy clothes, a man as large as Mr. Hopkins would not easily be mistaken as having a muscular build.[9] Furthermore, Mr. Hopkins’s actions at the bank on the evening of February 9, 2005 did not remotely match the bank robber’s modus operandi. The robber always covered his face and hands and approached the bank on foot, carrying a bag and gun. Mr. Hopkins, by contrast, had nothing covering his face or hands, and he drove up to the bank. He attempted to use the drive-through teller window before driving around to the front of the bank, which *937 would seem unusual for any bank robber and was surely so for the robber being sought. Finally, Mr. Hopkins was carrying a single piece of paper, his paycheck, not a gun or a bag. These differences, which are several and significant, suggest that the police acted unreasonably in determining that Mr. Hopkins should be subject to an investigatory stop.[10]
As for the detention of the Hopkinses, Appellants assert that “the length of time of the detention (40 minutes) was directly attributable to the period of time during which the police officers were exercising appropriate diligence to properly identify the Plaintiffs.” (Appellants’ Amended Op. Br. at 15.) However, as the Hopkinses point out, Appellants do not identify any steps that the officers took during that time to ascertain the Hopkinses’ identities.[11] Mr. Hopkins was cooperative throughout the stop and identified himself to the officers several times, but there is no indication that the officers did anything to confirm his identity. And while the robber was suspected of having an accomplice, no one suspected that he brought his family along. The presence of the Hopkinses’ children in the car should have immediately indicated to the police that Mr. and Mrs. Hopkins were not the bank robber and accomplice whom they were seeking.[12]
Accordingly, we agree with the District Court that, viewing the facts in favor of the Hopkinses,[13] the forty minute detention was unreasonable under the circumstances and thus violated the Fourth Amendment. Because we conclude that the District Court correctly determined that the officers’ actions were unreasonable under the lesser standard required to justify an investigatory stop, we need not address whether the District Court correctly decided that the stop never rose to the level of an arrest.[14]
IV. Conclusion
For the foregoing reasons, we affirm the District Court’s denial of Appellants’ motion for summary judgment as to qualified *938 immunity and remand for further proceedings consistent with this opinion.

. Although the suspect was always fully covered, witnesses said they were able to determine his race by observing patches of skin through the eyeholes of his ski mask or between his glove and jacket.

. The vehicle was registered to the Heart of God Christian Worship Center where both Mr. and Mrs. Hopkins were pastors at the time. It is not clear if or when the officers learned that fact.

. The parties dispute whether Mr. Hopkins committed any moving violations before he was pulled over. Defendants assert that Mr. Hopkins was driving aggressively and that he made improper lane changes, and that those actions contributed to their suspicions of criminal activity. The Hopkinses assert that no such moving violations were committed. Since this fact is in dispute, the District Court rightly resolved it in favor of the Hopkinses for purposes of the summary judgment analysis. Hopkins v. Vaughn, Civ. A. No. 06-323, 2008 WL 2048699, at *3 n. 4 (M.D.Pa. May 12, 2008).

.It is not clear where police obtained the photograph or why they were using it, since the suspect was always masked when he committed the bank robberies. Steffen testified that the photograph was one, among others, that he carried in his portfolio because the photographs "appeared to have value at the time." (App. at 510-11.)

. Defendants also moved for summary judgment as to the Hopkinses' request for punitive damages. The District Court granted that aspect of the motion as to the NYCRPD, and that decision is not before us on appeal. Hopkins, 2008 WL 2048699, at *10.

. After the Court ruled on the summary judgment motion, Mr. Hopkins died and Mrs. Hopkins, already a plaintiff in her own right, was substituted for Mr. Hopkins as the ad-ministratrix of his estate.

. At the time the District Court ruled on the summary judgment motion, the Supreme Court’s opinion in Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), required courts to answer the first inquiry in the qualified immunity analysis before turning to the second. After the District Court ruled on the motion, the Supreme Court issued Pearson, in which it held that ’’[¡judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the case at hand.” Pearson, 129 S.Ct. at 818.

. Appellants seem to have misunderstood tire District Court's conclusion concerning the initial stop. They state that "as the District Court acknowledged, the investigatory stop was appropriate, and [sic] as was the display of firearms.” (Appellants' Amended Op. Br. at 15.) However, the District Court made no such acknowledgment. Instead, the Court concluded that, despite the use of firearms and handcuffs, the initial seizure of the Hop-kinses was an investigatory stop rather than an arrest, but that the officers lacked the requisite reasonable suspicion to make that investigatory stop, rendering the stop unlawful. Hopkins, 2008 WL 2048699, at * *7-9.

. Despite the more detailed description of the suspect, Detective Vaughn only recalled the suspect being described as a large, black male. First, in light of evidence that a more detailed description of the suspect was given, we must resolve this discrepancy in favor of the Hopkinses, as the District Court appears to have done. See Hopkins, 2008 WL 2048699, at *1 (noting that the specific description "was distributed to all participants in the task force"). Furthermore, to the extent the officers were operating on the less detailed description of the suspect as a "large black male,” such a description is far too general on its own to justify the detention of Mr. Hopkins, especially since he did not act at all in accordance with the suspect's modus operandi. See United. States v. Brown, 448 F.3d 239, 247-48 (3d Cir.2006) (concluding that description that was "general” and “wildly wide of target” did not support reasonable suspicion).

. We note also, incidentally, that the Hop-kinses’ SUV would not likely be mistaken for a Dodge Stratus, Aspen, or Neon, which represented the type of get-away car the robber was suspected to have employed.

. Appellants state that ”[d]uring the brief time that [the Hopkinses] were handcuffed, the officers promptly dispelled their suspicions and released them.” (Appellants' Amended Op. Br. at 11.) However, they provide no explanation of, nor any record support for, the specific actions taken by police to dispel those suspicions. Appellants also state that the police were waiting for positive identification of the Hopkinses which "did not come until a person familiar with the Plaintiffs was able to positively identify them.” (Id. at 14-15.) Again, Appellants do not provide any record support for this statement. Although the record indicates that a minister who knew the Hopkinses arrived at the scene, Mr. Hopkins testified that the minister arrived because his children called him from the car, not because the police called him.

. Indeed, according to Detective Steffen, the officers realized that Mr. Hopkins was not the bank robber at the time they saw the children in the car.

. We would not have our description of the unfortunate events of that evening be understood as reflecting any judgment regarding the ultimate merits of the dispute. We are required at this stage of the proceedings to view the case from a vantage point that gives the Hopkinses every reasonable inference from the facts, which we have done, though we recognize that decisions made at the scene, in potentially dangerous circumstances, are often less clear-cut than they may appear after tire fact.

. Additionally, since Appellants did not challenge the District Court's conclusion that the officers acted unreasonably in light of clearly established law, we need not address that conclusion on appeal.