**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2640
_____

DENNIS OBADO,

Appellant

v.

UMDNJ, Behavioral Health Center;
ANTHONY THOMAS;
ANTHONY TOBIAS;
NYDIA SANTOS;
JOHN DOE (A-Z);
TRINITAS REGIONAL MEDICAL CENTER;
AWAIS SETHI;
JANE DOE (A-Z)
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cv-01344)
District Judge: Honorable Dickinson R. Debevoise
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 8, 2013

Before:   RENDELL, AMBRO, and VANASKIE, *Circuit Judges.*

(Filed: April 23, 2013)
_____

OPINION
_____

VANASKIE, *Circuit Judge.*

At issue in this appeal is whether mental healthcare professionals violated Appellant Dennis Obado's substantive due process rights by recommending that he be involuntarily committed to a mental health treatment facility and be cajoled into taking certain medication. Also at issue is whether Mr. Obado presented sufficient evidence to support his claim that his involuntary commitment violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794. Because we conclude that the healthcare professionals' decision to recommend involuntary commitment did not "shock the conscience" and Mr. Obado failed to present evidence that his involuntary commitment was the result of discriminatory animus, we will affirm the District Court's decision to grant summary judgment in favor of the Appellees.

I.

Since we write principally for the parties, we set forth only the facts essential to our analysis.

On March 28, 2007, Mr. Obado, who has a history of mental illness, went to the Robert Wood Johnson Medical Center with a complaint of neck pain. After concluding that Mr. Obado had no neck problems, but recognizing symptoms of mental illness, the staff referred him to Defendant University of Medicine and Dentistry of New Jersey—

2

University Behavioral Healthcare ("UMDNJ"), where staff conducted a screening under N.J. Stat. Ann. § 30:4-27.5.[1]

At UMDNJ, Defendant Nydia Santos, a certified mental health screener, and Defendant Dr. Anthony Tobia,[2] a physician, concluded that Mr. Obado posed a danger to himself and others, and Dr. Tobia certified him for involuntary commitment. Mr. Obado's medical records reveal that the certification was based on the following undisputed facts:

- Mr. Obado was suffering from paranoid delusions that Hispanic gang members were intent on killing him.

- Mr. Obado had stopped leaving his home over the past several months and would crawl on the floor in an effort to avoid being seen through windows.

- Mr. Obado had inquired of his brother about acquiring a gun.

As a result, Mr. Obado was transferred the following day, March 29, 2007, to Defendant Trinitas Hospital. There, Defendant Dr. Awais Sethi, a psychiatrist at Trinitas, conducted a psychiatric evaluation of Mr. Obado and similarly found that Mr. Obado

_____

[1] New Jersey law provides for screening of patients thought to require involuntary commitment for mental health treatment. N.J. Stat. Ann. § 30:4-27.5(a). If a psychiatrist or other designated physician concludes that involuntary commitment is necessary and that the patient is dangerous, he or she may complete a screening certificate indicating that inpatient treatment is required at a short-term care or psychiatric facility. *Id.* § 30:4-27.5(b), (e). If a psychiatrist at the short-term care or psychiatric facility determines that the patient requires further involuntary commitment, he or she may submit a clinical certificate and the screening certificate to the state court, which may order temporary authorization for the continued involuntary commitment upon finding probable cause that such commitment is required pending a final hearing. *Id.* § 30:4-27.10(a)(1), (g).

[2] The official caption refers to this Defendant as Anthony Tobias, but the parties refer to his surname as Tobia.

3

posed a danger to himself and others. Accordingly, Dr. Sethi completed a clinical certificate for involuntary commitment. Based on the screening and clinical certificates, the New Jersey Superior Court granted a petition for a temporary order for involuntary commitment pending a hearing to be held within twenty days.

Mr. Obado was treated for his mental health issues at Trinitas from March 29, 2007, until April 5, 2007. Initially, Mr. Obado refused to take medication prescribed by Dr. Sethi. After Dr. Sethi informed him that the staff could force him to take the medication, Mr. Obado relented.

On April 5, 2007, Dr. Sethi discharged Mr. Obado. The decision to discharge Mr. Obado was based upon progress made during the hospitalization and Mr. Obado's willingness to receive outpatient therapy, which he declined to consider when Dr. Sethi conducted his initial evaluation.

Mr. Obado brought this action two years later, on March 24, 2009. He asserts that Ms. Santos, Dr. Tobia, and Dr. Sethi violated his substantive due process rights by (1) involuntarily committing him or facilitating his commitment when he was not dangerous, and (2) using inaccurate assessment tools to evaluate the risk of danger and making stereotypic assumptions about him. Mr. Obado further claims that Dr. Sethi violated his substantive due process rights by threatening to administer medication over his objection, thereby forcing him to take the medication. In addition, he alleges that UMDNJ violated

4

the ADA and Trinitas violated Section 504 by making stereotypic assumptions about his dangerousness based on his status as an individual with mental illness.[3]

Following discovery, Defendants moved for summary judgment. The District Court found that the individual Defendants were entitled to qualified immunity and that there was no evidence that UMDNJ or Trinitas made decisions about Mr. Obado based on stereotypic assumptions, thereby precluding his claims under the ADA and Section 504. Accordingly, summary judgment was entered against Mr. Obado. This timely appeal followed.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), and we have appellate jurisdiction under 28 U.S.C. § 1291. We review a district court's decision to grant summary judgment de novo. *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Qualified Immunity and the Substantive Due Process Claim[4]

---

[3] The Third Amended Complaint also included several state law claims that Mr. Obado withdrew at the summary judgment stage.

[4] Where, as here, qualified immunity is asserted, we ask two questions: (1) did the defendant's conduct violate a constitutional or statutory right; and (2) if so, was that right so clearly established at the time of the defendant's actions that he or she would have reason to know that his or her conduct was wrongful? *See Pearson v. Callahan*, 552 U.S. 223, 232 (2009). With respect to the second question, a defendant is protected from liability if he or she acts on the basis of a reasonable mistake of fact or law. *Id.* at 231. As explained in *Pearson*, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the

5

In *Benn v. Universal Health System, Inc.*, 371 F.3d 165 (3d Cir. 2004), we held that the appropriate test for assessing liability in the context of involuntary commitment decisions is the "shocks the conscience" standard announced in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). *Benn*, 371 F.3d at 174.[5] Writing for our Court, then-Judge Alito observed that "[w]hether an incident 'shocks the conscience' is a matter of law for the courts to decide." *Benn*, 371 F.3d at 174. Applying this standard in *Benn*, we found that medical decisions to commit the plaintiff, which the plaintiff characterized as reflecting "'total incompetenc[e],'" were nonetheless not conscience-shocking given the

---

need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The District Court in this case found that, even though Mr. Obado had alleged sufficient facts to sustain a violation of his right to due process, the individual defendants had acted reasonably, and thus were entitled to qualified immunity. We agree that the individual defendants are entitled to qualified immunity, not only because they acted reasonably, but also because their actions did not violate Mr. Obado's rights. In this regard, we may correct a district court's erroneous conclusion at the first step of the qualified immunity inquiry. *See Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011).

[5] The District Court found that, "at worst," the individual healthcare professionals had made reasonable mistakes in concluding that Mr. Obado posed a danger to himself and others. In a footnote, however, the District Court suggested that Mr. Obado would not have to show that the individual Defendants' conduct shocked the conscience in order to establish a substantive due process violation because "involuntary commitment infringes on an individual's right to liberty, which is a fundamental right." (App. 17 n.11.) As indicated above, in accordance with our decision in *Benn*, the proper standard by which to analyze a substantive due process claim for involuntary commitment by healthcare professionals is the "shocks the conscience" standard. *See Benn*, 371 F.3d at 174. Indeed, the Second Circuit, on whose jurisprudence Mr. Obado relies to support his substantive due process claim, has concluded that the "shocks the conscience" standard applies to civil commitment proceedings. *See Bolmer v. Oliveira*, 594 F.3d 134, 144 (2d Cir. 2010) (holding that a "*substantial* departure" from accepted clinical standards and requirements is sufficient to "shock the conscience" in a civil commitment context (emphasis added)).

6

totality of the circumstances presented. *Id.* at 175. Consideration of the facts and circumstances here yields the same conclusion.

The underlying facts are not in dispute. Mr. Obado's medical records show that he had a history of paranoid delusions. He stated that a Hispanic gang was harassing and following him and that they were shining headlights into his room. He obsessively checked entrances to his home and crawled on the floor to avoid detection. Indeed, Mr. Obado had not left his house for two months out of fear. Importantly, his records also contain the following notation that:

> PT'S [Patient's] BROTHER REPORTS THAT THE MAJOR PRECIPITANT IN THE PT BEING REFERRED TO APS [Adult Protective Services] FOR PSYCH [psychiatric] EVAL [evaluation] TODAY WAS THE PT ASKING HIS BROTHER TO HELP HIM ACQUIRE A GUN FOR PROTECTIVE PURPOSES.

(App. 242.) At his initial evaluation, Mr. Obado refused to consent to voluntary outpatient treatment and would not allow healthcare professionals to consult his family members. Under these circumstances, the decision to recommend Mr. Obado for involuntary civil commitment is certainly not conscience-shocking.

Mr. Obado's reliance on an affidavit by Dr. Kenneth Selig is unavailing. In his affidavit, Dr. Selig attested that Mr. Obado did not pose a danger to himself or others when he was hospitalized at UMDNJ and Trinitas and that it was unreasonable for Dr. Sethi to conclude otherwise. Dr. Selig cited as a "critical mitigating factor that lowered the risk of harm that Mr. Obado posed" the fact that Mr. Obado lived with "concerned and supportive family members" who were not worried about Mr. Obado's potential

7

dangerousness and who could have intervened if he did become dangerous. (App. 867.) In addition, Dr. Selig opined that "basic clinical standards" demanded that Dr. Sethi should have questioned Mr. Obado about his attempt to acquire a gun or at least have spoken to his brother before relying upon that fact in concluding that Mr. Obado posed a danger. (*Id.* at 868.)

Dr. Selig's emphasis on the failure of Dr. Sethi to communicate with Mr. Obado's family in evaluating Mr. Obado ignores the fact that Mr. Obado did not consent to having Dr. Sethi speak with his family until April 3. Two days after being granted this permission, Dr. Sethi discharged Mr. Obado. Furthermore, the failure to conduct a more detailed inquiry concerning Mr. Obado's expressed desire to obtain a gun for protection does not render Dr. Sethi's decision conscience-shocking. In short, Dr. Selig's affidavit does not preclude us from deciding, as a matter of law, that the decision to recommend Mr. Obado for involuntary civil commitment does not shock the conscience. *See Benn*, 371 F.3d at 176 (expert affidavit opining that mental healthcare professionals acted with gross negligence in recommending involuntary civil commitment did not preclude court from deciding, as a matter of law, that no reasonable jury could find that the doctors were grossly negligent).[6]

---

[6] Even if the shocks the conscience standard did not apply in this context, we agree with the District Court that, "at worst," the healthcare professionals' decisions in this case were the product of the kind of reasonable mistakes in judgment covered by the doctrine of qualified immunity. *See Pearson*, 555 U.S. at 231 ("[Q]ualified immunity covers mere mistakes in judgment, whether the mistake is one of fact or one of law." (internal quotation marks omitted)).

8

We also conclude that Dr. Sethi did not shock the conscience by informing Mr. Obado that hospital staff would administer medication over his objection if he did not voluntarily take it. As we stated in *Benn*, "authorities may administer antipsychotic drugs over a patient's objection 'where the decision is a product of the authorities' professional judgment.'" *Benn*, 371 F.3d at 175 (quoting *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990)). Here, it is evident that Dr. Sethi's encouragement of Mr. Obado to take the medication or else it would be administered over his objection was within his professional judgment and therefore did not shock the conscience.[7]

## B. ADA and Section 504 Claims

Mr. Obado also argues that the staff at UMDNJ and Trinitas "ignored well-accepted clinical tenets of risk assessment and made unfounded, stereotypic assumptions about Mr. Obado simply because he was paranoid and manifest[ed] other symptoms of mental illness." (Appellant's Br. 30.) As a result, Mr. Obado claims that UMDNJ and Trinitas violated the ADA and Section 504, respectively.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his

---

[7] Because we hold that the individual Defendants did not violate Mr. Obado's constitutional rights and that they nevertheless would be entitled to qualified immunity, we need not address the District Court's conclusion that those Defendants were acting under the color of state law for purposes of § 1983.

9

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Some courts have recognized that plaintiffs may bring claims of disability discrimination based on stereotypic assumptions about individuals with mental illness. *See Bolmer*, 594 F.3d at 149 (declining to conclude as a matter of law that involuntary commitment based upon stereotyped views of the mentally ill did not violate the ADA). We, however, need not decide whether claims of disability discrimination under the ADA or Section 504 based on stereotypic assumptions are viable because we agree with the District Court that Mr. Obado presented no evidence of discriminatory animus on the part of UMDNJ or Trinitas. Mr. Obado points to no discriminatory policies, contemporaneous statements, or any circumstantial evidence suggesting UMDNJ or Trinitas acted under the assumption that all individuals with mental illness exhibiting paranoid delusions require involuntary commitment. Absent such evidence, no genuine dispute as to any material fact exists relating to Mr. Obado's ADA and Section 504 claims, and UMDNJ and Trinitas are entitled to summary judgment.

III.

For the foregoing reasons, we will affirm the judgment of the District Court.

10