WILKINSON, Circuit Judge,
concurring in part:
I am happy to concur in the judgment of affirmance and in Part III.C of the majority opinion. Having resolved the case by properly awarding judgment to defendants on qualified immunity grounds, the majority had no need to opine on the merits of the excessive force claim. In fact, it runs serious risks in doing so.
This was a close case, the very kind of dispute in which judicial hindsight should not displace the officers’ judgmental calls. I do not contend that the officers’ behavior was impeccable here, but I do believe, with the district court, that it was not the kind of action that merited an award of monetary damages.
I.
These are difficult situations. It is undisputed that on April 23, 2011, Armstrong had been off his medications for days and was in an unpredictable and erratic state. J.A. 210-19. It is undisputed that by the time Officer Sheppard arrived at the scene, Armstrong was engaged in self-destructive behavior — eating grass, dandelions, and gauze, and burning his arms and tongue with cigarettes. Id. at 507-08. It is undisputed that the police obtained an involuntary commitment order to bring Armstrong back to the hospital. Id. at 534. It is undisputed that Armstrong did not want to return to the hospital despite his sister’s pleas to stop resisting authorities. Id. at 231. It is undisputed that Armstrong was a strong man, and weighed about 260 pounds. Id. at 297-98, 411. It is undisputed that before the officers ultimately detained Armstrong they did not have an opportunity to frisk him for weapons. Id. at 464. It is undisputed that the sign post Armstrong gripped was near a trafficked intersection. Id. at 461. It is undisputed that the officers “had observed Armstrong wandering into traffic with little regard for avoiding the passing cars and the seizure took place only a few feet from an active roadway.” Maj. Op. at 901. It is undisputed that the officers applied graduated levels of force — first verbal commands and then a “soft hands” approach — prior to Officer Gatling’s use of his Taser. J.A. 514. It is undisputed that Armstrong tried to kick the officers as they put handcuffs on his legs. Id. at 573. “The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation” Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). That pretty much describes the situation here.
II.
Having thoughtfully resolved the appeal on qualified immunity grounds,* the ma *911 jority launches into an extended discussion on the merits of the excessive force claim. This is so unnecessary. Sometimes it is best for courts not to write large upon the world but to discharge our simple rustic duty to decide the case.
The Supreme Court in Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), gave us the discretion to do just that. Pearson is admittedly a decision with a bit of back and forth, but its salient contribution was to liberate the lower federal courts from the onerous shackles of the Saucier v. Katz regime and allow them to proceed directly to a qualified immunity analysis without addressing the merits first. In this regard, Pearson recognized the foremost duty of courts to resolve cases and controversies. Id. at 242, 129 S.Ct. 808. That, at least, is what Article III established us to do.
In fact, proceeding in such a manner is often the preferable course. The majority says it must go further in order to provide clarity in future cases, Maj. Op. at 909-10, but that clarity is often illusory. Today’s prescription may not fit tomorrow’s facts and circumstances. Our rather abstract pronouncements in one case may be of little assistance with the realities and particulars of another.
As the Supreme Court noted, “the rigid Saucier procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.” Pearson, 555 U.S. at 236-37, 129 S.Ct. 808. So I would respectfully prefer not to get into the first prong of the Saucier analysis here. It is “far from obvious,” to use the Court’s term, that the trial court’s conclusion that “[ajdditional reasonable force was appropriate under these circumstances” was unsound. J.A. 767.
Clarity is arguably most difficult to achieve in Fourth Amendment cases because bright-line rules at most imperfectly take account of the slight shifts in real-life situations that can alter what are inescapably close judgment calls. As the Supreme Court noted,
Although the first prong of the Saucier procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development. For one thing, there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases. See Scott v. Harris, 550 U.S. 372, 388, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (BREYER, J., concurring) (counseling against the Saucier two-step protocol where the question is “so fact dependent that the result will be confusion rather than clarity”); Buchanan v. Maine, 469 F.3d 158, 168 (C.A.1 2006) (“We do not think the law elaboration purpose will be well served here, where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts”).
Pearson, 555 U.S. at 237, 129 S.Ct. 808.
My fine colleagues in the majority have done as good a job as can be expected *912 given the circumstances. But the very-exemplary quality of the effort serves to illustrate the perils of the enterprise. The majority notes “that different seizures present different risks of danger,” Maj. Op. at 904, but fails to recognize that the spectrum of risk presented cannot be easily sketched by an appellate court. It is hard to disagree with the majority’s highly generalized assertion that Taser use is unwarranted “where an unrestrained arres-tee, though resistant, presents no serious safety threat.” Id. But of course, what conduct qualifies as “resistant,” and what rises to the level of a “serious safety threat” is once again dependent on the actual and infinitely variable facts and circumstances that confront officers on their beat.
Tasers came into widespread use for a reason. They were thought preferable to 'far cruder forms of force such as canines, sprays, batons, and choke-holds, and it was hoped that their use would make the deployment of lethal force unnecessary or at least a very last resort. None of this of course justifies their promiscuous use. The majority “tie[s] permissible taser use to situations that present some exigency that is sufficiently dangerous to justify the force.” Maj. Op. at 903. But with all due respect, that abstract formulation will be of less than limited help to officers wondering what exactly they may and may not do.
We are told further that the officers, though armed with a civil commitment order, do not possess the same degree of latitude with regard to a mentally ill person as with someone whom there is reason to believe has committed a crime. Id. at 899-900. All well and good, but the majority then notes that “[mjental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations.” Id. at 900. Again, what may seem a comforting appellate nostrum is of limited utility to those faced with volatile situations far removed from the peaceful confines of appellate chambers. The majority goes on to note that “in some circumstances ... increasing the use of force may ... exacerbate the situation.” Id. (internal quotation marks omitted). But what those circumstances are neither my colleagues nor I can really say.
I finally cannot agree that the plaintiff here posed no real danger. He certainly posed a danger to himself having been off medication and engaging in self-destructive behaviors to the point that his sister was pleading for her brother’s prompt return to the hospital where he might receive some help. As for the danger to others, it was hardly unlikely that the plaintiff, a sizeable and unrestrained individual, would bolt into the street and cause a traumatic accident for motorists who, if not themselves injured, would regret the harm inflicted on this pedestrian for years to come. I say this not to contend that the case was easy, but that it was hard. The district court rightly recognized that its intrinsic difficulty afforded no reason to deliver these officers an unnecessary rebuke.
III.
The majority has left it all up in the air. And its approach to this case is not without consequence. The great majority of mentally ill persons pose no serious danger to themselves or others and the challenge of society is to help these good people lead more satisfying lives. A smaller subset of the mentally ill do pose the greatest.sort of danger, not only to themselves but to large numbers of people as the string of mass shootings in this country will attest.
It is difficult sometimes for even seasoned professionals to predict which is *913 which, not to mention 'officers and others with more limited training. And yet it is important in this area that law not lose its preventive aspect. It can be heartbreaking to wait until the damage is done. Delivering vague proclamations about do’s and don’ts runs the risk of incentivizing officers to take no action, and in doing so to leave individuals and their prospective victims to their unhappy fates. Law enforcement will learn soon enough that sins of omission are generally not actionable. See DeShaney v. Winnebago Cty. Dep’t of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). And in the face of nebulae from the courts, the natural human reaction will be to desist. Perhaps this is what we mean to achieve, but over-deterrence carries its own risks, namely that those who badly need help will receive no help, and we shall be the poorer for it.

 Normally, "clearly established” law is found by looking to Supreme Court cases and the cases in the circuit in which the officers are located. See Marshall v. Rodgers, - U.S. -, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013). My good colleagues range somewhat further afield here, but I think doing so in this case in no way affected the outcome.