**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 12, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THOMAS F. MILLER, an individual;
VIPONT INC., a Nevada corporation,

     Plaintiffs - Appellants,

v.

STATE OF UTAH; UTAH
DEPARTMENT OF NATURAL
RESOURCES; UTAH DIVISION OF OIL,
GAS AND MINING; JOHN BAZA, both
individually and in his official capacity as
Division Director; LYNN KUNZLER, both
individually and in his official capacity as
Division Inspector; PAUL BAKER, both
individually and in his official capacity as
Minerals Program Manager; JOHN DOES
I - XX,

     Defendants - Appellees,

and

NORTHSTAR ENERGY, LLC, a
Delaware limited liability company,

     Defendant.

No. 14-4155
(D.C. No. 2:12-CV-00420-RJS-DBP)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **LUCERO**, **GORSUCH**, and **McHUGH**, Circuit Judges.

_____

In this appeal, Appellants Thomas Miller and Vipont Inc. challenge the district court's grant of summary judgment to the Appellees, who are various entities and employees of the State of Utah. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's determination that each of the defendants enjoys governmental immunity.

# I

This case arises out of the reclamation of the Vipont Mine in Box Elder County, Utah. Mr. Miller bought the mine in 1968 and initially handled the mine's compliance with state regulations himself.[1] In 1985, he filed a "Declaration of Exemption" with the Utah Division of Oil, Gas, and Mining ("Division"). At the time, state law allowed smaller mining operations to avoid the reclamation requirements imposed by the Utah Mined Land Reclamation Act. Accordingly, the Division recognized disturbances at the mine as exempt until the relevant statute was amended in 1987. That amendment required reclamation even at smaller mines unless the mine was abandoned before the 1987 amendment became effective.

For a while, Division inspections suggested the mine may have been abandoned. In 1994, however, Division employees noticed signs of recent activity at the mine. As a result, the Division sent Mr. Miller a letter explaining his exemption

---

[1] For ease of reading, we refer to the Appellants collectively as "Mr. Miller."

2

was no longer valid and requiring him to file a Notice of Intention (NOI) to conduct new or continuing operations, including "a statement that the operator shall conduct reclamation." *See* 1987 Utah Laws 806, 808 (codified at Utah Code § 40-8-13(1)(b), current version at Utah Code § 40-8-13(1)(c)). Mr. Miller never responded. In fact, he had no further communications with the Division for almost fifteen years.

Instead, the Celebration Mining Company filed an NOI for the mine in March 1995. Celebration represented to the Division that it had the legal right to enter the property and conduct mining operations. Celebration obtained the entire mine at a judgment creditor sale on May 5, 1995, and later reconveyed 75% of the ownership interest to Mr. Miller by quitclaim deed.[2] Division employees knew of the sheriff's sale of the mine to Celebration, but were unaware of the subsequent quitclaim deed. The Division notified Celebration that the NOI could not be approved until Celebration submitted a map of the area affected by the proposed mining operations. Celebration did not submit a map but did, along with its successors in interest, submit annual reports and pay annual permit fees.

After seven years passed without receiving a map, the Division created a map and sent it to Celebration in 2003. The Division's map overlaid GPS coordinates

---

[2] The details of the business arrangement between Mr. Miller and Celebration are unclear. In the parties' original agreement, Celebration agreed to acquire increasing interests in the mine from its parent company, United Silver Mines, Inc., in exchange for combinations of stock and cash. *See Miller v. Celebration Mining Co.*, 29 P.3d 1231, 1233 (Utah 2001). But this agreement was ultimately voided because United Silver Mines had been administratively dissolved at the time the agreement was executed. *See id*. Nevertheless, by virtue of some arrangement not contained in the record, Celebration deeded Mr. Miller a 75% interest in the mine after acquiring the mine at the sheriff's sale.

3

from data recorded during a site visit onto a topographical map of the mine. The map did not identify any portion of the land as exempt from reclamation. Lynn Kunzler, the Division employee who prepared the map, admitted in his deposition that his failure to identify any of the disturbances on the property as exempt likely reflected his belief that Mr. Miller's original declaration of exemption was not properly issued. The Division never received any indication that the map was inaccurate.

In 2006, the Division entered into a reclamation agreement with Aurora Oil and Gas Corporation, Celebration's corporate parent, wherein Aurora agreed to reclaim lands affected by the mining operations and to provide a letter of credit as surety. Three years later, Aurora filed for bankruptcy and the Division made a demand on the surety. As a part of its bankruptcy proceedings, Aurora entered into a stipulation with the Division in which it agreed to conduct reclamation. The stipulation indicated Aurora owned only 25% of the mine but did not identify any other owner. After the stipulation was signed, an unidentified person contacted the Division asking whether "Silver Stone," an entity unknown to the Division that claimed to own 75% of the mine, should pay a portion of the mine's permit fee. The Division explained to the caller that the source of the funds was not important, so long as they were credited properly.

In October 2009, the Division notified Aurora that because the mine had been inactive for more than ten years, reclamation was now required. The Division offered Aurora a choice between performing the reclamation itself or surrendering its surety and allowing the Division to conduct the reclamation. Aurora chose to

4

perform reclamation. Aurora's decision was memorialized in a stipulation with the Division, which provided that Aurora would retain a contractor recommended by the Division, that Aurora could sell or otherwise dispose of any equipment or buildings located at the mine, and that Aurora owned a 25% interest in the mine. Aurora, by then known as Northstar Energy LLC, reclaimed the mine in June 2010. During the cleanup, excavation, and regrading of the property, personal property at the mine was demolished.

Two months later, after over 15 years of silence, Mr. Miller contacted the Division seeking information about the destruction of the personal property at the mine.[3] Celebration and its successors had apparently never informed Mr. Miller of the developments regarding reclamation, including the 1995 NOI's promise to reclaim or the more recent decisions relating to the reclamation plans. Mr. Miller brought an administrative action before the Board of Oil, Gas, and Mining, but the board lacked the power to award damages for the loss of the property. Mr. Miller then filed this suit in the district court against Northstar and the Defendant-Appellees, alleging violations of procedural and substantive due process under 42 U.S.C. § 1983; a taking without just compensation under 42 U.S.C. § 1983; and state-law claims for breach of contract, conversion, waste, negligence, and nuisance.

The parties filed cross motions for summary judgment. The district court denied Mr. Miller's motion and granted the motion of the State, its entities, and its

---

[3] Mr. Miller does not claim there was damage to any real property.

5

employees, certifying the order as final as to these parties because some of Mr. Miller's claims against Northstar remained at the time. Mr. Miller and Northstar later settled the outstanding claims and the district court dismissed the case. Mr. Miller's appeal from the district court's grant of summary judgment in favor of the State Defendants is before us in this appeal. We review the district court's summary judgment ruling de novo, applying the same legal standards as the district court. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

## II

As counsel conceded before the district court, Mr. Miller's federal causes of action for damages against the State, the Division, the Department of Natural Resources, and state employees acting in their official capacities are barred by sovereign immunity. *See Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010) (noting that the Eleventh Amendment proscribes suits against state agencies and employees in federal court absent a waiver by the state); Aplt. App. Vol. 1 at 174–75. And as determined by the district court, Mr. Miller's federal causes of action against the employees in their individual capacities are barred by qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity is an affirmative defense to a section 1983 action, providing

6

immunity from suit from the outset." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (brackets omitted). We review the denial of qualified immunity de novo, viewing the record in the light most favorable to the nonmoving party. *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008).

To survive summary judgment after a defendant has claimed qualified immunity, the plaintiff must demonstrate both "(1) that the defendant's actions violated a constitutional or statutory right and (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1150 (10th Cir. 2006) (internal quotation marks omitted). The Supreme Court has held that the federal district and appellate courts have discretion to determine which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case. *Pearson*, 555 U.S. at 236.

## A

As an initial matter, the district court's factual findings and reasonable assumptions normally "comprise the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (internal quotation marks omitted). However, "when the district court at summary judgment fails to identify the particular charged conduct that it deemed adequately supported by the record, we may look behind the [summary judgment order] and review the entire record de novo to determine for ourselves as a matter of law which factual inferences a reasonable jury could and

7

could not make." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010). Here, the district court did not construct a specific factual universe for the evaluation of qualified immunity, instead ruling on the merits of the constitutional claims by paradoxically, adopting "the State's factual assertion of the record." Aplt. App. Vol. 1 at 228. Fortunately, however, the facts of this case are, with a few exceptions, uncontested. Mr. Miller offers only the following facts contrary to the State's assertions: (1) Mr. Kunzler intentionally left out exempt land when creating the 2003 map; (2) NorthStar never provided Mr. Miller with requisite notice despite its claim that it did; (3) reclamation was not required after 10 years of inactivity; and (4) Mr. Miller and Celebration were tenants-in-common, not co-tenants. With the exception of (3),[4] we construe these factual assertions in favor of Mr. Miller for purposes of our analysis.

### B

"For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (brackets and internal quotation marks omitted). "A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts

---

[4] Whether or not Utah law requires reclamation after 10 years of inactivity is a question of law, not a question of fact. And the Division has broad statutory authority to require reclamation in its discretion. Utah Code § 40-8-7(1)(b).

must have found the law to be as the plaintiff maintains." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (internal quotation marks omitted).

With respect to Mr. Miller's procedural due process claim, the Fifth and Fourteenth Amendments prevent the federal government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amends. V, XIV. A fundamental requirement of due process is notice and the opportunity to be heard. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (considering constitutional sufficiency of notice to beneficiaries of common trust fund). The Due Process Clause does not, however, guarantee the right to actual notice. *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (considering constitutional sufficiency of notice to owner of real property subject to pending tax sale). Rather, due process requires that notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314; *see also Miner v. Clinton Cty.*, 541 F.3d 464, 472 (2d Cir. 2008) (holding that this inquiry is objective, not subjective). Whatever the variable circumstances of notice may be, "the constitutionality of a particular procedure for notice is assessed *ex ante*, rather than *post hoc*." *Jones*, 547 U.S. at 231.

That Mr. Miller was entitled to notice reasonably calculated to apprise him of the potential destruction of his property is clearly established, but the degree necessary for the notice to be constitutionally sufficient is dependent on the unique facts at issue. In *Mullane*, the Supreme Court recognized that, "in the case of persons

9

missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." 339 U.S. at 317. "Nor do we consider it unreasonable for the State to dispense with more certain notice to those beneficiaries whose interests . . . , although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee." *Id.* In *Mennonite Board of Missions v. Adams*, 462 U.S. 791 (1983), the Court stated that notice of a pending tax sale of real property "by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party . . . if its name and address are *reasonably ascertainable*." *Id.* at 800 (emphasis altered). And in *Jones*, the Court again considered the constitutional sufficiency of notice that real property would be sold to satisfy unpaid taxes. The Court held that due process requires "reasonable followup measures," 547 U.S. at 235, if a party "becomes aware prior to the taking that its attempt at notice has failed," *id.* at 227. But in *Jones*, the Court stopped short of requiring, as a threshold due process requirement, a search of public records where "[a]n open-ended search for a new address . . . imposes burdens on the State significantly greater than" the "relatively easy options" considered by the Court. *Id.* at 236.

Here, the facts do not support a claim that the Division employees violated Mr. Miller's clearly established right to due process. Mr. Miller acquired title to the

10

personal property in 1994 and then lost it at the sheriff's sale in 1995.[5] Although Celebration deeded back to Mr. Miller 75% of the mine including the personal property in 1997, Division employees were aware of the sheriff's sale but "were never informed . . . that [the mine and personal property] ever changed ownership again." Aplt. App. Vol. 1 at 258, 141:4–6. Mr. Miller points to the bankruptcy stipulation between Aurora and the Division as indicating Aurora owned only 25% of the "Vipont Mine Corporation." But the stipulation did not identify any other owner of the real property or indicate that any personal property was located at the mine. State Supp. App. Vol. 1 at 121. And while Mr. Miller also relies on the call made to the Division after the stipulation was signed, the unidentified caller merely asked whether "Silver Stone," an entity unknown to the Division, should pay a portion of the mine's permit fee. Aplt. App. Vol. 1 at 294–95, 59:7–14 & 64:22–65:5. Although the Division had dealt with Mr. Miller at one time, Mr. Miller ended that communication by never responding to the Division's letter requesting a NOI. During the ensuing fifteen years, the Division interacted with Celebration and its successor operators concerning reclamation of the mine and there is no evidence to suggest the Division was aware that Mr. Miller retained an ownership interest in personal property located at the mine.

---

[5] Mr. Miller claimed before the district court that he owned 100% of the personal property at issue, citing to the 1994 Bill of Sale, which is located in the district court's record. No. 2:12-CV-0420, Doc. 107-32, Ex. FF. But that claim is suspect due to the deeds conveying the mine, including the personal property. State Supp. App. Vol. 2 at 386–88 (conveying "other property, real, personal, or mixed in or on or pertaining to the [mine] claims"); State Supp. App. Vol. 2 at 389–90 (same).

Under these facts, the Appellees' actions did not violate Mr. Miller's clearly established due process rights. First, unlike the situations addressed by *Mullane*, *Mennonite*, and *Jones*, the state actors here were unaware that there was an unidentified owner of the property at issue. And because the taking in this case did not involve real property, we reject Mr. Miller's contention that the State should have discovered his ownership through a "simple property search of the county's recorder's office." Opening Br. at xvii. Admittedly, the personal property at issue did happen to be the subject of documents recorded in Box Elder County. But there is no clearly established authority that would have required the State to search those records on the remote possibility that the mine reclamation might impact personal property not owned by the mine operator and that the owner of such personal property might be reflected in a recorded document. The due process clause requires only reasonable efforts to provide notice under the particular circumstances. Here, the only contact with the State on behalf of the mine for almost a decade and a half was through the mine operator, in the form of Celebration or its successors in interest. The State acted reasonably by notifying the mine operator of the reclamation plan and relying on the operator to provide further notice as necessary to the owner of any personal property affected by the reclamation.[6] Because there is no

---

[6] During negotiations for sale of its interest in the mine in 2008, Celebration proposed that Mr. Miller assume Celebration's duties under the reclamation contract, No. 2:12-CV-0420, Doc. 51-23 at 10, and provided him with a copy of the reclamation contract. Doc. 51-24 at 7–12. Thus, although Mr. Miller may not have known the precise time when reclamation would begin, he was aware that Aurora had executed an agreement to reclaim the mine.

12

clearly established authority holding that the Division was required to search the public records to ascertain whether any personal property at the mine might be owned by persons other than the operator, we agree with the district court that Mr. Miller cannot establish a violation of his procedural due process rights. *See Mullane*, 339 U.S. at 314; *see also Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands." (alteration in original)).

## C

Mr. Miller next contends the State's action is unconstitutional regardless of the procedure employed because it so shocks the conscience that it violates his substantive due process rights. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998). To establish a substantive due process violation, Mr. Miller must prove, "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (internal quotation marks omitted). The Due Process Clause, however, is "not a guarantee against incorrect or ill-advised government decisions," *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013). Instead, the Supreme Court has instructed "that only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 840 (internal quotation marks omitted); *see also Hernandez*, 734 F.3d at 1261 ("To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of

13

oppression." (brackets and internal quotation marks omitted)). The district court correctly concluded that Mr. Miller fails to meet this burden as a matter of law.

Mr. Miller identifies the Division's creation of the NOI map in 2003 as the governmental activity that shocks the conscience. According to Mr. Miller, as part of a decade-long plan to force reclamation of exempt property, Division employees intentionally failed to note that disturbances on the real property were exempt from reclamation. But Mr. Miller's argument misses the mark. Even assuming the map was part of a scheme to impose reclamation obligations on legally exempt real property,[7] the map is silent as to the treatment of personal property located at the mine. Thus, the creation of the map cannot support a finding that the Division engaged in deliberate and shocking action designed to deprive Mr. Miller of his personal property.

Rather than support a finding of deliberate and shocking efforts to deprive Mr. Miller of his personal property, the undisputed facts show the Division created the map only because Celebration failed to do so over a period of seven years. And as the foregoing discussion of Mr. Miller's procedural due process claim makes clear,

---

[7] Although we assume the areas of disturbance qualified for an exemption for purposes of analysis, we note that the relevant statute exempted from reclamation only land already reclaimed or "lands in which mining operations have ceased prior to July 1, 1977." Utah Code § 40-8-4(13)(a)–(b). Mr. Miller admits in his factual recitations before us and the district court that mining activity continued at the mine until 1988. Opening Br. at xiii; *accord* State Supp. App. Vol. 2 at 259. And there is nothing in the Utah Mined Land Reclamation Act to indicate that lands previously operating under a declaration of exemption continued to be exempt under the new statutory scheme. Notably, in its report to the reclamation contractor, the Division stated that pre-1975 disturbances at the mine did not require reclamation. State Supp. App. Vol. 1 at 128–29.

14

the Division was unaware that Mr. Miller retained an interest in personal property at the mine. Thus, even if the reclamation map is assumed to be the culmination of a long plan to impose burdens not required by law, it falls far short of an outrageous and shocking plan to deprive Mr. Miller of his personal property. *See Moore v. Guthrie*, 438 F.3d 1036, 1041 n.1 (10th Cir. 2006) (rejecting the argument that prolonged opportunity to deliberate necessarily constitutes conscious-shocking behavior). "Were this not so and any long-deliberated decision (resulting in later injury) were called conscience-shocking, substantive due process violations would become a substantial and unnecessary substitute to state tort law." *Id*.

Considering the undisputed facts, including all reasonable inferences that favor Mr. Miller, we hold as a matter of law that the Division employees did not violate Mr. Miller's substantive due process.

## III

With respect to his state-law claims, Mr. Miller appeals only his claims for negligence, conversion, and waste. Under the Eleventh Amendment, states and their political subdivisions are immune from suits in federal court by their own citizens absent the state's consent to be sued. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). The determination of whether sovereign immunity has been waived under the Governmental Immunity Act of Utah turns on three elements: "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver." *Van de Grift v. State*, 299 P.3d 1043, 1045 (Utah 2013).

15

## A

The Act provides that governmental entities and employees are "immune from suit for any injury that results from the exercise of a governmental function." Utah Code § 63G-7-201(1). "Governmental function" is defined broadly as "each activity, undertaking, or operation of a governmental entity" or of "a department, agency, employee, agent, or officer of a governmental entity." Utah Code § 63G-7-102(4)(a)–(b). There are no provisions in the Act waiving immunity for intentional torts, but the Act expressly waives immunity "as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment." Utah Code § 63G-7-301(2)(i). There is an exception, however, to the "negligent act or omission" waiver if the injury alleged "arises out of or in connection with, or results from . . . the issuance, denial, suspension, or revocation of, or the failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization." Utah Code § 63G-7-201(4)(c). There is also an exception to this waiver if the injury alleged results from "the exercise or performance, or the failure to exercise or perform, a discretionary function, whether or not the discretion is abused." Utah Code § 63G-7-201(4)(a).

The State entities are immune from Mr. Miller's tort claims under the Utah Governmental Immunity Act of Utah. Contrary to the position advanced by Mr. Miller, the creation of the map was a governmental function. The map was required as part of the NOI process and the reclamation obligation, which was to be identified in the final NOI. And the NOI and the approval of a reclamation plan are

16

the type of "permit, license, certificate, approval, order, or similar authorization" for which an exception to the waiver of immunity exists. Further, although the obligation fell on Celebration to create the map, the Division made the discretionary decision to move to process forward by creating the map itself, thereby falling within still another exception to the waiver of immunity. But even if the creation of the map could be deemed neither a governmental function nor a discretionary function, immunity would still bar Mr. Miller's tort claims. The destruction of Mr. Miller's personal property was not caused by the creation of the map, but by the reclamation — which even Mr. Miller concedes is a governmental function. Opening Br. at 33.

**B**

The Governmental Immunity Act of Utah also permits tort claims against individual employees if they "acted or failed to act through fraud or willful misconduct." Utah Code § 63G-7-202(3)(c)(i). "Willful misconduct" means "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury." Utah Code § 63G-7-102(10). Mr. Miller invites us to conclude based on an inference from the record that Division employees harbored a grudge against him based on their disagreement with his initial exemption and therefore intentionally failed to note the exempted disturbances on the map the Division created in 2003. But Mr. Miller's factually unsupported allegations do not pass even the plausibility test set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), for assessing whether a complaint can survive a motion to dismiss. At the summary judgment stage, even

17

more is required; Mr. Miller must come forward with *evidence* to support his allegations. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (discussing the burden on the party who bears the burden of proof at successive stages of the litigation and stating that "[i]n response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which . . . will be taken as true" (internal quotation marks and citation omitted)). Mr. Miller has failed to come forward with even a scintilla of evidence to suggest Division employees intentionally excluded information on the NOI map in 2003 knowing that Mr. Miller's personal property would be destroyed by a third party during reclamation in 2010. In the absence of any evidence of fraud or willful misconduct, the individual defendants are immune from Mr. Miller's state-tort claims.

**IV**

Mr. Miller's federal due process claims are barred by qualified immunity and his state-law tort claims are barred by the Governmental Immunity Act of Utah. We therefore affirm the judgment of the district court, holding the defendants are immune from suit without reaching the merits of Mr. Miller's claims.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

18